## UNITED STATES v. KICHIN.

(District Court, E. D. Missouri, E. D. November 26, 1921.)

No. 5158.

1. **Courts ⊚⟲375—Federal courts recognize, but are not conclusively bound, by state limitation statutes.**

    Federal courts sitting in equity recognize and apply state statutes of limitation, though they may not be bound by them absolutely.

2. **Aliens ⊚⟲71½, New, vol. 7 Key-No. Series—One living in concealed bigamous relation when naturalized not law-abiding within statute.**

    One who made a second and bigamous marriage in 1904, which continued when he was admitted to citizenship in 1912, had not been a moral and law-abiding citizen for five years before such naturalization, within the meaning of the statute (Comp. St. § 4352, subd. 4), but was guilty of such fraud in concealing a fact which would have prevented his naturalization as to constitute ground for its cancellation.

⊚⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Aliens ⬤⟶60—Naturalization not a right, but a matter of grace.**

Naturalization is not made as of course, but is an act of grace, applicant not demanding it, but petitioning for it, and no vested right thereto exists, and the court may examine conduct of applicant antecedent to the five years mentioned in Comp. St. § 4352, subd. 4, as bearing on qualifications for citizenship.

In Equity. Suit by the United States against John Jacob Kichin to cancel a certificate of naturalization. Decree for the United States.

M. R. Bevington, Chief Naturalization Examiner, of St. Louis, Mo., for the United States.

Matt G. Reynolds, Chase Morsey, and Horace Dyer, all of St. Louis, Mo., for defendant.

FARIS, District Judge. At a session of court held in St. Louis, Mo., on November 26, 1921, the court orally [1] announced the following opinion:

This case was submitted to the court on the merits, after a full and complete hearing. I am now ready, or partially ready, or ready as I will ever be (the many duties confronting me considered), to decide it. This is an action on the equity side of this court, brought by the United States, as complainant, to set aside and cancel a certificate of naturalization issued by this court to defendant some time in the year 1912, for that, as it is alleged by complainant, this certificate was procured by fraud.

The specific ground of fraud invoked in the case by the government is that defendant, at the time of the issuance to him of the certificate in question, was not a man of good moral character, and also, perhaps, that upon the hearing had in this court on his application for naturalization he fraudulently concealed certain facts as to his prior history and behavior.

Specifically, upon the question of his alleged immoral character at the time of his naturalization, it is averred that he was living with a woman with whom he had contracted a bigamous marriage. The evidence touching the question whether, when defendant married his present wife (called such for convenience only), he then had another wife living, is voluminous, and somewhat contradictory. Without taking up time or space in weighing this evidence here, I am convinced that the preponderance of it establishes the fact of such former marriage.

Briefly, on this question, I find the facts to be that defendant and one Yetta Yankofsky were married to each other about the year 1890. This marriage seems to have occurred in Russia, and to have been according to the religious rites of the Hebrew church. There was some contradiction as to the place of its occurrence; some of the witnesses having stated that it occurred in Germany. This contradiction may arise, and probably does arise, from the fact that the homes of the two parties were, at the time the alleged marriage was contracted, quite close to the boundary of Germany.

Shortly after this marriage, defendant and the woman Yetta left

---

[1] This oral opinion is published in the Federal Reporter at the special instance of the Chief Naturalization Examiner.

Russia and went to London, England, where they lived together as man and wife until the year 1900, when defendant left his London family, then consisting of such wife and four children begotten of this relation, and went to reside in South Africa. In the latter place defendant, without procuring a divorce, married, or went through a marriage ceremony with, the woman with whom he is now living, and ever since has lived, as his wife. As late as the year 1911, and just prior to his procuring the certificate of naturalization here sought to be canceled, defendant saw fit to induce, by the payment to her of 50£, or about $250, the woman Yetta to sign a paper wherein it was mutually recited that she had never been married to the defendant. In passing, I may state (though the fact, in the view which the court takes of it, has little bearing upon the final result) the defendant there gave his address as London, England, notwithstanding it is apparent that if he were naturalized, as undoubtedly he was in 1912, his address must have been St. Louis, Mo. But, as stated, I pass that as having a negligible bearing upon the result, however the fact, arguendo, may be otherwise of value.

Even if the circumstances of the procurement of this paper I have just referred to were not suspicious, if the statements therein were not contradicted by the actions, efforts, and language of defendant, and by the testimony of a cloud of witnesses, and if the mutual conclusion that defendant and said Yetta were not married to each other do appear therein, this paper yet recites facts from which a common-law marriage arises, for it says they cohabited and lived together as man and wife for ten years, and that said Yetta during said period of ten years lived as, and passed as, Yetta Kutchinsky, and as the wife of the said Jacob Kutchinsky.

In passing it may be said that the present name under which defendant is here sued, to wit, that of John Jacob Kichin, was acquired, either when he was naturalized, or was changed by him of his own volition, since he came to the United States, for the evidence is conclusive that when he left Russia, and when he lived in London, he passed by the name of John Jacob Kutchinsky.

Even after the execution of the above-named paper, defendant continued his efforts to procure, seemingly according to the rites and rules of the Hebrew religion, a so-called divorce from the woman Yetta, and these efforts were continued by him up to the time of the death of the woman Yetta, which occurred only some six or eight months ago.

So far as the record discloses, the defendant has lived (barring his continued bigamous relation with his second wife) an upright and moral life since he came to the United States. Touching alleged immoralities of defendant while in South Africa, however, much testimony was adduced upon the trial. But these alleged immoralities, in the view which I take of the case, need not be gone into now, and have, in the view of the court, but a negligible bearing upon the point before it.

It is contended on the part of the defendant that, regardless of whether he was or was not married in 1890 to Yetta, that since for

more than five years next before he was naturalized his conduct as a resident alien here was impeccable, that this is all that is required or contemplated by the statute. The statute relied on reads, so far as it is pertinent to the point urged, as follows:

"It shall be made to appear to the satisfaction of the court * * * that immediately preceding the date of his application he has resided continuously within the United States five years, at least * * * and during that time he has behaved as a man of good moral character." Comp. St. § 4352, subd. 4.

Counsel for defendant therefore contend that it makes no difference what his moral behavior or conduct may have been before he came to this country, if for five years prior to his naturalization he has been a moral and a law-abiding citizen. This they urge is all that is required, and no fraud, they contend, mete for cancellation of his citizenship, can be bottomed upon any act which occurred more than five years before he was naturalized. In short, it is urged by defendant, that the five-year period mentioned in the statute quoted so far constitutes an absolute statute of repose as that, whatever his prior conduct may have been, the government may not go behind such period and urge antecedent crimes or immoralities. This view, I think, loses sight of the facts here involved. When defendant applied for and was granted citizenship, it was not known to the government that he was then living in bigamous adultery with a woman who was not his lawful wife. Clearly, if this fact had been disclosed on the hearing, no order naturalizing him would have been entered. This condition existed until the death of his first wife, which occurred long after this present action was commenced. The facts on which this action is based did not become known to the government until a very short time before this action was begun.

[1] Merely in passing, I may suggest that federal courts sitting in equity recognize and apply state statutes of limitation, though they may not be bound by them absolutely. If this rule were applicable and decisive, the action is in time. Section 1316 R. S. Mo. 1919. But it will be seen that reliance is had by defendant, not upon a general statute of limitations, but upon the specific language of the section which I have quoted above. Many cases are to be found wherein actions such as this were brought more than five years after the issuance of the certificate of naturalization. See U. S. v. Mansour (D. C.) 170 Fed. 676; U. S. v. Spohrer (C. C.) 175 Fed. 440; U. S. v. Luria (D. C.) 184 Fed. 643; U. S. v. Ellis (C. C.) 185 Fed. 546; U. S. v. Raverat (D. C.) 222 Fed. 1018; U. S. v. Wursterbarth (D. C.) 249 Fed. 908; U. S. v. Darmer (D. C.) 249 Fed. 989; Johannessen v. United States, 225 U. S. 240, 32 Sup. Ct. 613, 56 L. Ed. 1066; U. S. v. Herberger (D. C.) 272 Fed. 278. The case of United States v. Luria was afterwards ruled on by the Supreme Court of the United States, and it is reported under the title of Luria v. United States, 231 U. S. 23, 34 Sup. Ct. 10, 58 L. Ed. 101.

[2] It will be noted, of course, that this is not yet the precise point relied on, which is that, since the second marriage of defendant occurred not later than 1904, and since he was naturalized in 1912, he

had for more than five years prior to the date at which he was naturalized been a moral and law-abiding citizen, and this (so counsel for defendant contend) is all that the statute requires, regardless of his conduct prior to the beginning of such five-year period.

The first difficulty met in applying this view arises from the fact that defendant's immorality was a continuing fact, and this fact was not known to the government when it naturalized him. Obviously, had he disclosed then that he had living two wives, from the first of whom he had not been divorced when he married the second, no order would have been entered here naturalizing him. Defendant was required to make oath that he did not believe in either the theory or practice of polygamy. It is hardly conceivable that he would have been naturalized, had he admitted, rather than concealed, the fact that he was then practicing polygamy.

[3] Moreover, I think it is apparent that the view urged here by defendant loses sight of the fact that an order of naturalization is not made as of course, but it is made as an act of grace; that an applicant for citizenship does not demand naturalization, but petitions for it, and that no vested right in such petitioner to have this privilege accorded to him exists in law. Luria v. United States, 231 U. S. 23, 34 Sup. Ct. 10, 58 L. Ed. 101; In re Sigelman (D. C.) 268 Fed. 217.

It is obvious that the view urged by defendant could be the law only if the court were compelled to naturalize one who, born in a foreign country, had therein broken every commandment in the decalogue, and had committed every crime in the criminal calendar, if, forsooth, on coming to this country he had seen fit to temporarily reform for five years.

It logically follows, I think, that the five-year period mentioned in the statute quoted is not a statute of repose, in so far as to preclude a court from going beyond it, in order to ascertain the behavior and antecedent conduct of the petitioner, for the purpose of so far judging the future by the past as to form a conclusion whether benefit or harm would accrue from such petitioner's admission as a citizen. To take any other view of the law would be tantamount to saying that which all the decisions hold cannot be said, namely, that one applying for citizenship does so as a matter of right, and not as an humble petitioner for an act of grace.

As I read the statutes, they vest discretion in the trial courts in matters of naturalization. This discretion is, of course, not an arbitrary discretion, but rather a judicial one, and I cannot read the statute in such wise as to construe it to mean that the greatest criminal who ever left his native country unhung may come to this country, and after five years of impeccable conduct demand, and on his demand compel, the acceptance of himself as a citizen by this country. Unless this can be done, I am of opinion that the position of defendant's learned counsel cannot be sustained, and so the case comes back to the point whether, if all of the facts now presented to this court had been before the court when defendant was naturalized, would he have been naturalized, or would the court, notwithstanding such knowl-

edge, have been by law compelled to naturalize him? I cannot be brought to so conclude.

Since, then, the full facts were not developed on account of the fraudulent withholding of them by defendant when the naturalization herein was had, I am of opinion that a decree ought to be entered, on the facts found, for plaintiff, canceling the certificate of naturalization.

Let a decree be submitted accordingly.

