## UNITED STATES v. MURRAY.
### Civil Action No. 621.

District Court, E. D. Arkansas, W. D.
March 1, 1943.

Sam Rorex, U. S. Atty., and William H. Gregory, Asst. U. S. Atty., both of Little Rock, Ark., for plaintiff.

Grover T. Owens, of Owens, Ehrman & McHaney, of Little Rock, Ark., for defendant.

TRIMBLE, District Judge.

On August 1, 1942, the United States of America, acting through its District Attorney, brought this suit against the defendant, Margarete Asbeck Murray, under and pursuant to section 338 of the Nationality Act of 1940, 54 Stat. 1158, 8 U.S.C.A. § 738, asking the cancellation of her American citizenship, which the sovereign had conferred upon her as matter of grace and not of right.

The defendant is a native of Germany, having been born at Karlsruhe, Baden, in 1909, and she first entered this country as an exchange student. At the expiration of that period, she returned to Germany, and re-entered this country as an immigrant on October 7, 1932, under the name of Margarete Asbeck, at which time she was the wife of one Fritz Asbeck, a native and citizen of Germany. At the time this action was begun, she was a resident of the City of Little Rock, Pulaski County, Arkansas, therefore within the jurisdiction of this Court, and this Court has jurisdiction of this cause of action.

Before the 26th day of July, 1940, at which time defendant filed a petition for naturalization, she had begun a divorce proceeding in the State Court of Louisiana, at New Orleans, and had obtained a decree, and had married one Matthew Murray, an American citizen, with whom she is now living.

The defendant filed her petition for naturalization in the U. S. District Court for the Southern District of Texas, at Houston, and the petition contained the statements alleged in the complaint. On the 7th day of November, 1940, in the said Court, she took the oath of allegiance prescribed, and set forth in the complaint, and on that day that Court entered an order admitting her to citizenship in the United States of America, and certificate of naturalization No. 4885347 was issued as alleged.

In addition to the above facts which are admitted, the complaint alleges certain of the representations by the defendant in her petition for naturalization were false and fraudulent in that she was not attached in fact to the principles of the Constitution of the United States at the time of filing nor during the five years prior thereto, and that she did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to Germany, her native country, but intended at all times involved herein to retain her allegiance and fidelity to her native land; that she did not intend to support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, and did not intend to bear true faith and allegiance to the same, but that she intended to and did remain loyal to and a subject of Germany, and maintained her German allegiance. That she procured the certificate of naturalization fraudulently and illegally, solely for the purpose of obtaining the rights, privileges and protection of American citizenship, without intending to assume the duties thereof.

To this complaint, the defendant filed an answer, admitting as stated above, but denying all fraudulent conduct, and asserting that she was attached to the principles of the Constitution and laws of the United States, and was now, and intended at all times to become and be, a loyal American citizen.

On January 13, 1943, in response to motion for bill of particulars, the plaintiff filed an amendment to the complaint, in which it set out with more particularity the charges against the defendant upon which it intended to rely. In this amendment it is alleged that her fraudulent conduct consisted in not advising the Court that she was a person of bad moral character and more particularly alleged:

(1) That she was guilty of embezzlement from the Ore and Chemical Corporation, in New York City, and that she had fraudulently concealed this from the plaintiff, and,

(2) That she had by fraud obtained a divorce from Fritz Asbeck in the State Court of Louisiana, at New Orleans; that she alleged in her petition for divorce that she had been a resident of Louisiana for four years prior to the filing of the action, when in truth and in fact she had not been, and that she did this knowingly and willfully, and,

(3) That she had defrauded one Walter Hugo Heyman, of New York, New York, of large sums of money by fraudulently pretending that she intended to marry the said Walter Hugo Heyman, when, as a matter of fact, she did not so intend to marry him.

On January 22, 1943, the defendant filed interrogatories to be propounded to the

proper officer or person for answering, and on January 27, 1943, the plaintiff answered the interrogatories in which it set out in detail what each witness would testify, gave the name of the witness and place of residence. At the trial, these witnesses were produced and placed upon the witness stand and testified substantially as set forth in the answers to interrogatories.

The witnesses for each of the parties have been presented, have been ably cross-examined, and the defendant as well as the plaintiff has been given every opportunity to present any and all evidence which to them seemed pertinent or admissible.

The Act of Louisiana in effect at the time the defendant filed her action for divorce in New Orleans required a residence of four years, and in this petition for divorce which was filed in October, 1937, and which she verified under oath, she alleged that she had been a resident of Louisiana, as follows: "2. On or about December of 1929 your petitioner and defendant came to the City of New Orleans, Louisiana and there established a matrimonial domicile, in which they lived as man and wife."

This allegation, according to defendant's own testimony, was false in at least four particulars. She did not come to New Orleans with her husband, Fritz Asbeck, she did not come in 1929, she and her husband did not establish a matrimonial domicile there, and they did not live in said matrimonial domicile as man and wife.

Defendant's explanation of these misstatements was that she did not know the requirement of the Louisiana law as to residence; that she told her lawyer all the facts and signed where he said; and that she relied wholly on his judgment.

However, Walter Hugo Heyman, who accompanied her from New York to New Orleans when she went there about the last of April or first of May, 1937, testified that he investigated the matter of a divorce for her, that he consulted a lawyer, learned the requirement as to residence, was told by a reputable lawyer that she could not get a divorce without four years' residence, that he then disclosed to the defendant the result of his investigation, and that they thereupon planned to go to Reno, Nevada, later and secure a divorce there where the requirement as to residence was for a shorter time. Furthermore, in a letter of July 1, 1938, some seven or eight months after her marriage to Mr. Murray, she was still writing to Mr. Heyman, and she wrote: "I will tell you about that also. I was not really divorced, if I want to consider it strictly. The divorce was decreed, of course, but A. (her former husband) protested to the bitter end, hence my trip to Frisco last year. * * * I am living now, as before, for myself alone. Mr. Murray, of course, only loaned me his name; * * *"

The defendant is not an ignorant, inexperienced, uneducated woman, of the clinging type, who must lean and rely upon others, but is a well educated, experienced woman of the world. In her letter to Heyman she said of herself, "I do not trust anyone."

Agents of the Bureau of Investigation testified that Mrs. Murray told them, when they interviewed her in the presence of her husband, that she knew that she had perpetrated a fraud on the court when she secured her divorce; and that "her husband then came to her rescue and said he had helped put it over." This is uncontradicted by either the defendant or her husband.

Mr. Jones and Mr. Newsum, Agents of the Federal Bureau of Investigation, witnesses for the Government, testified that when they interviewed the defendant, in the presence of her husband, that she stated she had been employed by the Ore and Chemical Corporation, that she there was charged with embezzlement and confessed to it, and that when she filed her petition for naturalization she did not state that she had been employed by the Ore and Chemical Corporation because she feared if she did an investigation would be made and it would be found she had confessed to embezzlement and it would prevent her being naturalized, and that she left the information out of her petition for this reason.

While on the witness stand, the defendant, on direct examination and again on cross-examination, testified to the same thing; that she left out of her petition the information that she had been employed by the Ore and Chemical Company for fear she would not receive naturalization. She denied that she was guilty of embezzlement but said she signed it on advice of counsel, whom she had employed to conduct an investigation and who actually interviewed the officials of the company. There was also introduced in evidence former petition in which she stated she had not been employed at all during the five years preceding, but had been a housewife.

The crux of the Government's complaint as to her connection with the Ore and

Chemical Company is the fact that she concealed it, to prevent an investigation, because she feared if it were known she would not be admitted to citizenship.

█ If this information had come to the Court at the time it passed upon her petition, unexplained, her petition would certainly have been denied. Therefore, she concealed from the Court information which would have affected the judgment of the Court and was guilty of perpetrating a fraud upon the Court.

Walter Hugo Heyman, who it is charged the defendant defrauded, appeared as a witness on behalf of the plaintiff, and testified at length as to his meeting the defendant while she was employed at the Ore and Chemical Company, her discharge from that position, and his contacts, relationship, conversations, and correspondence with her thereafter. He introduced in evidence letters, telegrams and radiograms from the defendant to him, dating from April or May of 1937 until July, 1938. Some of these letters were written by the defendant while she was on a visit to Germany, in 1938. At least one radiogram was introduced which was sent from Germany during the same visit. Many of these letters, telegrams and radiograms requested him to send her money, the radiogram from Germany requesting a sum equivalent to $125. Mr. Heyman testified that these sums of money were advanced or loaned to her by him because of his love for her, and because she had promised to marry him, and because they had agreed to marry and open up a business of their own at some place "in the West". Mr. Heyman introduced in evidence an itemized statement of the money which he advanced to her. Some of these requests for loans were made in 1938, some months after the defendant had married Mr. Murray, in November, 1937.

Defendant admitted the writing of every letter and the sending of every telegram and radiogram introduced in evidence, and admitted receiving each and every sum of money testified to by Mr. Heyman and shown in the correspondence. She testified that she wrote these letters because of her fear of Mr. Heyman; that he knew of her confession to having committed embezzlement which she had signed at the Ore and Chemical Corporation, and that he held this over her head and told her if she tried to get away from him or ceased to correspond that she would be prosecuted for the embezzlement; that Mr. Heyman continued to work at the office of the Ore and Chemical Company after she had left there. However, a reading of these letters, which were introduced in evidence, discloses they were written, at least some of them, in most endearing terms, and none appear such as one would write to a person whom they feared.

While Mr. Heyman, according to his own testimony, does not show up as a saint, a hero, or a man of good, sound judgment or morals, with knowledge of the world, he did show up as a man who was deeply infatuated with the defendant, and absolutely under her domination and control. Neither in her testimony, nor in her correspondence, did she ever point out one single instance wherein he failed to do as she requested, except he refused to leave her and forget her when she told him to. As late as July 1, 1938, she was writing Mr. Heyman, assuring him of her regard for him, and telling him that she had married Mr. Murray for protection. After her protector-husband had "intimidated" her former husband "by hitting him on the chin with his fist", she assured Mr. Heyman: "I am waiting for you out of love and decency; I have turned down brilliant marriages, etc. three times." In this letter she assured him her marriage to Murray was a "gentleman's agreement", and that Murray had only loaned her his name. At other times she assured him Murray would give her a divorce whenever she asked it.

A study of her letters and testimony, together with the testimony of Mr. Heyman, and the other evidence in the case, convinces the Court that the defendant never intended to marry Mr. Heyman, but that her sole purpose was to secure from him such sums of money as she could, and that she misled him deliberately for her own gain, defrauded him of his earnings, and left him to live on his unemployment compensation.

█ No alien has a right to naturalization, nor can he purchase or earn that right. The conferring of citizenship is an act of grace on the part of the sovereign, and a matter of privilege on the part of the petitioner. To secure the granting of that privilege to him, the petitioner must comply strictly with the law.

"Citizenship is granted to aliens not as a right, but merely as a privilege upon complying with all the provisions of the federal statutes." United States v. Shapiro, D.C., 43 F.Supp. 927, 928. See United States v. Ness, 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed.

321; United States v. Ginsberg, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853; United States v. Beda, 2 Cir., 118 F.2d 458, 459; United States v. Kichin, D.C., 276 F. 818, 822; United States v. Etheridge, D.C., 41 F.2d 762; United States v. Zgrebec, D.C., 38 F.Supp. 127; United States v. Parisi, D.C., 24 F.Supp. 414.

■ The defendant was under every obligation to disclose to the court to which she made application for citizenship all the pertinent facts, and in answering questions must exercise good faith, to say the least, if not the utmost good faith.

In United States v. Shapiro, supra, the Court said: "Good faith, which means a fair and full disclosure of all of the facts by an alien to the immigration officials and to the courts, is required of every alien seeking one of the highest privileges that can come to an individual. Had the facts been disclosed to the United States District Court for the Eastern District of New York, it is clear that the citizenship certificate would never have been issued." Citing United States v. Marcus, D.C., 1 F. Supp. 29. See United States v. Etheridge, D.C., 41 F.2d 762, and cases cited there; United States v. Zgrebec, supra; Application of Levis, D.C., 46 F.Supp. 527.

■ The defendant did not, under the evidence in this case, act with the required good faith toward the Court and naturalization officials, and her conduct was fraudulent.

Witnesses for the Government, who had known the defendant in Houston, Texas, and Cuba, testified:

After December 7, 1941, the defendant said that the United States had brought the war with Japan on itself, and had no business meddling in the affairs of Japan; the defendant told them she had worked at the German consulate in New Orleans in 1937, that a part of her duties was to read the newspapers and magazines and cut out clippings of all information of interest to the German government; that the German government had a list of everyone living in the United States who had relatives in Germany. That upon one occasion her conversation became so violently pro-German her husband reminded her she was an American citizen and she replied that she was a German, "a piece of paper does not make me an American". In discussing a statement by Von Spiegel, German Consul·at New Orleans, in which he said Germany would remember after the war the help the United States was giving Britain, the defendant said that Von Spiegel was a fool for having made the statement, but that it was true, and Germany would remember. One witness testified on cross-examination that the defendant's disloyalty became so apparent she called the Federal Bureau of Investigation and asked for an investigation, that it came to a point "where my country meant more to me than her friendship." On one occasion, the defendant made some statements which caused one of the witnesses to ask her whether she got the same thrill he did when the "Star Spangled Banner" was played, and her reply was, "Oh, Port, I am an American citizen, but in my heart I will always be a German." The defendant said it was not right for England to bomb Germany, and when reminded that Germany had bombed England she replied that England was merely getting what was coming to her, that this was the first time England had ever had to fight her own war. When Germany invaded Poland, Austria, the Lowlands, Belgium, Denmark and Norway, she said that Germany was only taking back what was rightfully hers. She further said that the United States stole the country from the Indians and why should they criticize Germany; when the differences were pointed out, she still insisted that Germany was no worse than the United States. She said, "The lousy rich Americans did nothing for South America but exploit the poor people." That in speaking of the various treaties which Germany had broken, she said: "Why should a scrap of paper stop Germany from taking what is rightfully hers?"

In her letter to Mr. Heyman, dated "Gret'sl birthday", 1938, with the salutation "Dear Walter", she made the statement: "I still maintain even today that the Americans' have no right to judge other countries, their policies, which they consider rapacious, after they themselves stole the land from the Indians. They only see their greatness and energy in their successful struggle (to exploit the soil.) With regards to politics—I did not want to come to that—what is actually happening in Germany? I read in a local paper, that published the report belatedly and definitely distorted, that Hitler's new move reached Austria. May I ask you for your information and opinion. You sit there at the source and hear all sides. Here in Fort Stockton (Texas) today a film, "The Inside Truth of Nazi Germany" is being

shown. Naturally I shall go see it and tell you about it. It is definitely anti-propaganda and will be cut accordingly."

The defendant said to a witness for the plaintiff who knew the defendant in Cuba, whose husband was connected with the same company as Mr. Murray, that she, the defendant, joined the Nazi party in Germany when young, because the Nazi party had all the food, and that was the only way she could get food for her family. The defendant said she was reared by parents who were devout Catholics, but witness says Mrs. Murray did not affiliate with the Catholic Church and was "not a practicing Catholic". On cross-examination, she testified the defendant told her she had secured a divorce and remarried, which the witness understood was against the canons of the Catholic Church. Her relationship with the church was admitted solely for its possible corroboration of the testimony that she had been a member of the Nazi party. After the witness returned to the United States, she again met the defendant who told her she was very uncomfortable in the United States, she wished her husband would secure a position in South America so she could get out of the United States, and that she was afraid to tell even the witness "what her thoughts were".

Defendant offered in evidence affidavits and testimony of witnesses present in Court as to her good reputation, and this was admitted over the objection of plaintiff. They testified that they had theretofore known the defendant, at different places and times, many of the witnesses while she was resident in Little Rock, Arkansas. The gist of their statements was that while they were with the defendant they never heard her say or saw her do anything "derogatory" to the United States, nor say or do anything "incompatible with being a good citizen". Some of them gave their opinion as to the good reputation and innocence of the defendant.

The most that can be said for this type of evidence is that it is negative evidence, and each of the witnesses who were cross-examined testified they were not with her at all times and did not know what she might have said, done or written in their absence. This was so obviously true that it was scarcely necessary to cross-examine the witnesses even to that limited extent. However, the Court has taken this evidence into consideration, along with the other evidence in the case, for what it is worth. Furthermore, the defendant knew from July 3, 1942, until she left Little Rock late in that year that she was under investigation and might naturally be more cautious and circumspect than otherwise.

Neither the defendant in her own testimony, nor did any of her witnesses, point out to the Court an instance where the defendant ever said anything or did anything in favor of the United States, did anything to aid the United States in its war effort, or expressed a single wish for its success in its death struggle with the defendant's native country, or its ally Japan. Two of the witnesses did say that after she had expressed the thought that she was still a German, she said she would never do anything against the United States, but even this did not express a wish or hope for her adopted country winning the war, or any desire on her part to aid it.

A case very much in point is that of United States v. Herberger, D.C., 272 F. 278, 289, where the Court said: "It may be that the defendant was in many respects an industrious and useful member of society; but that is not the question to be determined. It will be noted that there are no expressions in his letter or attributed to the defendant prior to the controversy having arisen showing any anxiety for the welfare of the United States or a desire for its success in the war. Taken at their face value, these expressions indicate more interest in the welfare of Germany than that of the United States, and nothing has appeared in this case to remove or alter such showing in any substantial respect. * * * While the defendant, Herberger, has not been shown to have done any overt act to further the hostile designs of Germany, nor counseled or advised the doing of such acts by others, his letter shows sympathy for Germany in the war, and that he himself was disloyal to this country. * * *" See also Schneidermann v. United States, 9 Cir., 119 F.2d 500, 503; United States v. Woerndle, 9 Cir., 288 F. 47; United States v. Mickley, D.C., 44 F.Supp. 735.

■ In a suit to cancel a certificate of naturalization and revoke the order of Court admitting her to citizenship, on the ground of fraud in that she deceived the court with respect to her adherence to the principle of the Constitution, her good moral character, and her state of mind at that time, her prior and subsequent acts are admissible as tending to show her state of mind when she made her application. Glas-

er v. United States, 7 Cir., 289 F. 255, and cases cited.

■ Taking into consideration all of the facts and circumstances shown here, not only in the testimony of witnesses for the plaintiff, but the documentary evidence, the letters written by the defendant, and the testimony of the defendant while a witness in her own behalf, the Court is of the opinion that the Government has sustained the charges that the defendant obtained the order of court admitting her to citizenship by a fraud upon the court, and that the order ought to be revoked and the certificate of naturalization issued thereon canceled.

Findings of fact, conclusions of law and judgment in accordance with the views here expressed have been filed.