## UNITED STATES v. POLZIN.

### Civ. No. 1687.

District Court, D. Maryland.

Dec. 16, 1942.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., for United States of America.

Jesse Slingluff, Jr., of Baltimore, Md., for defendant.

COLEMAN, Judge.

This is a proceeding brought by the Government under the provisions of Section 338 of the Nationality Code, enacted October 14, 1940, 8 U.S.C.A. § 738, for the purpose of revoking and setting aside the order of this court admitting the defendant, Albert Erfried Polzin, to citizenship on February 12, 1934, and canceling the certificate of naturalization issued to him, on the ground that such order and certificate were fraudulently and illegally procured by him in that the représentations in his petition for naturalization were false and fraudulent because he was not, in fact, as he was required to state under oath and did so state in that petition, attached to the principles of the Constitution of the United

States at the time he filed his petition nor during the five years prior thereto; did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to the German Reich, of which he was then a subject, but in fact intended to retain allegiance and fidelity thereto; and did not in fact intend to reside permanently in the United States; and likewise that all of the representations made by the defendant in his oath of allegiance which he was required to take and did take at the time he was naturalized were false and fraudulent because he did not, in fact, as recited in his oath, renounce and abjure all allegiance and fidelity to Germany; because he did not, in fact, intend to support the Constitution and laws of the United States against all enemies, foreign and domestic; and because he did not, in fact, intend to bear true faith and allegiance to the same, but, in fact, intended to remain a subject of the German Reich and to maintain allegiance thereto.

The defendant has denied these allegations of the Government's complaint. Full hearing has been had; witnesses testified for both the Government and the defendant. The defendant himself testified at great length and the case was fully argued by counsel.

The defendant was born near Freiberg, Germany, on February 11, 1903, and came to this country for the first time on May 15, 1925; that is to say, when he was twenty-two years old. A little less than a year and a half later, that is, on September 20, 1926, he filed his declaration of intention to become an American citizen. In 1927 he married a German citizen. Six years later, that is, on September 20, 1933, he filed his petition for naturalization and was naturalized by this court on February 12, 1934.

In the summer of 1934 he spent a short time in Germany on an alleged pleasure trip with his wife. From 1934 down to the present time he has practiced his trade, which has been that of a cabinet maker, and more recently has worked in several national defense and war production plants, from one of which he was discharged because suspected of subversive activities. At the present time he is employed by a local woodworking company, which is engaged in the production of war materials.

The defendant has three brothers who are, or at least were when last heard from, fighting in the German Army. He himself attended a military school in Germany for noncommissioned officers during the period of the last world war. He has never been prosecuted for any offense since he arrived in this country.

■ In support of its claim that the representations of the defendant made in his petition for naturalization and his oath of allegiance were false and fraudulent, for the reasons which have already been set forth, the Government relies exclusively upon testimony, and upon the inferences based thereon, of acts and statements of the defendant, all of which were subsequent to the time when he took the oath of naturalization; that is, subsequent to February 12, 1934, but the Government claims that these acts and statements require the conclusion that at the time he filed his petition for naturalization and took the oath, he did so with the mental reservation of loyalty and allegiance to Germany which he had sworn to renounce; in other words, that what the defendant said and did subsequently to 1934 establishes fraudulent intention at the time he applied for, and obtained, American citizenship.

■ The testimony discloses that the defendant was president of a group known as "The Friends of New Germany" shortly after its organization in Baltimore in October, 1934. Originally, German nationals as well as United States citizens of German origin were eligible, and in fact members of this society, but about this time, apparently to create public impression that it was strictly an American organization, it was openly announced that henceforth only American citizens were eligible for membership. The defendant resigned his office and membership after five or six months. This organization was really the same as the Amerika Deutscher Volksbund, commonly known as the American-German Bund or the German-American Bund, which name was adopted in 1936, because the former name sounded too German. Secretly, there appears to have been no strict adherence to the rule that only American citizens were eligible for membership. Apparently, the "Friends of New Germany" as such ceased their activities in Baltimore in 1935. There is no direct evidence that defendant, after resigning from "The Friends of New Germany", was ever a member or actively associated with the Bund or its many affiliated, subversive organizations. It is

unnecessary to relate their history here. Suffice it to say that as a result of investigations conducted by the Federal Government in recent years, it has become common knowledge that these organizations were financed and controlled, directly or indirectly, by the Nazi Party in Germany; that, in a word, they had one common purpose, to unite all German-Americans under the Bund and then to have national socialism replace democracy in this country. In furtherance of this object, they sought the assimilation of the entire German-American youth with the Bund; they issued many publications of the most insidious and subversive character; they advocated racial inequality and disobedience to law, as evidenced by the fact that numerous national and local leaders of the Bund were found to have conspired to commit sedition, to cause disobedience to the Alien Registration Act, 8 U.S.C.A. § 451 et seq., and to the Selective Service Act, 50 U.S.C.A. Appendix § 301 et seq. The Bund required that its members should be considered Germans, no matter what citizenship they might possess; that is, allegiance and fidelity to Germany was the sine qua non. The Bund was dissolved in December, 1941, after unsuccessful efforts to continue under the guise of some other organization. It is common knowledge that a number of those active in the Bund in this country have been high officials in the Nazi regime in Germany, and that several of its leaders have been prosecuted criminally and convicted in this country.

The defendant admitted in the course of his testimony that as a result of his trip to Germany in the summer of 1934, he had become indoctrinated with Nazi ideas but claimed he did not see anything wrong with "The Friends of New Germany", that their object was to further better understanding and relations between Germany and this country. He admitted that he admired Hitler and what he had done to improve the economic conditions of Germany. He admitted that he may have said, since his return from Germany in 1934, that he was a Nazi, but he claims that he now has a keener sense of loyalty to this country than he had at the time he was naturalized, because of the fact that the country is at war.

Prior to the time of his naturalization, he was not a member of any German society except a beneficial organization which the Government does not claim indulged in any fifth column or pro-German activity; but prior to the time of defendant's naturalization, no German societies of a subversive character had been organized in Baltimore,—at least not in so far as has been disclosed by the evidence in this case.

The Government produced a large number of witnesses, friends, employers and fellow employees of the defendant, as well as various Government representatives who had made an extensive investigation of the defendant and what he had done from the time he first came to this country up to the present time.

Summarizing those parts of this testimony which are the more extreme in character, in so far as indicating anti-American acts, statements, or tendencies, we find that between 1937 and 1941 the defendant displayed pictures of Hitler and also reproductions of the German flag in his home; exhibited upon his person and his automobile, in public, the Swastika emblem; possessed in his home a large amount of subversive German publications; said he would not fight against Germany and could not be made to do so; admitted that he was a Nazi; said he would go back to Germany except for the fact that he could make a better living in this country; and said that the Jews would get their just deserts after Hitler conquered this country. All of this testimony has either been admitted as true by the defendant or, where denied, the denial is not convincing to this court. But, reprehensible as unquestionable is all of the aforegoing testimony, the record is devoid of any actual proof of disloyal or subversive conduct or statements on the part of the defendant prior to the date of his naturalization in 1934, nor is there any proof of such within seven or eight months after that time, nor at or about the time we entered into the present war, or since, except the following: (1) One of the sponsors or witnesses for the defendant in connection with his naturalization testified that several months after this event—the witness was unable definitely to fix the time, but it was some eight months thereafter—he heard the defendant say, "I would give my right arm to be an aide of Hitler." The defendant denied that he ever made this statement, and the witness made no claim that at the present time he had reason to believe that when he vouched for the defendant's unqualified loyalty to the United States prior

to the defendant taking the oath of allegiance in 1934, the defendant had deceived him; (2) a lieutenant of the special police force attached, to the Bendix Radio Corporation in Baltimore testified that the defendant, while employed by that company, told him some time around February, 1942, that he was a Nazi at heart and a Bund member.

There can be no question but that subsequent acts or statements may be sufficient to prove a particular state of mind at a given time. It is equally true that the fact that nothing may have happened subsequent to that time to call for the manifestation of the particular state of mind is not, in and of itself, sufficient to warrant the conclusion that that particular state of mind may not nevertheless be presumed to have existed at the earlier time. In other words, the fact that subversive German societies, membership in which would have been open to the defendant, had they existed, were not, in fact, in existence in Baltimore at or prior to the time when the defendant was naturalized, or the fact that this country was not at war during the time when the defendant is alleged to have conducted himself in a disloyal manner and to have made disloyal statements, is not, in and of itself, conclusive of impossibility or improbability of disloyalty existing at the time of naturalization. However, since the statute upon which revocation of citizenship can alone be predicated requires proof of fraud or illegality at the time citizenship was obtained, there must be satisfactory proof that such actually occurred at that time. Does such proof exist in this case? This is the question that we must answer.

It is well settled that the Act under which the Government seeks to cancel the citizenship of the present defendant is constitutional. "An alien has no moral nor constitutional right to retain the privileges of citizenship if, by false evidence or the like, an imposition has been practised upon the court, without which the certificate of citizenship could not and would not have been issued. * * * The act makes nothing fraudulent or unlawful that was honest and lawful when it was done. It imposes no new penalty upon the wrongdoer. But if, after fair hearing, it is judicially determined that by wrongful conduct he has obtained a title to citizenship, the act provides that he shall be deprived of a privilege that was never rightfully his." Johannessen v. United States, 225 U.S. 227, 241-243, 32 S.Ct. 613, 617, 56 L.Ed. 1066. "Citizenship is membership in a political society, and implies a duty of allegiance on the part of the member and a duty of protection on the part of the society. These are reciprocal obligations, one being a compensation for the other." Luria v. United States, 231 U.S. 9, 22, 34 S.Ct. 10, 13, 58 L.Ed. 101.

The more common, obvious type of case justifying the cancellation of citizenship on the ground of fraud or illegal procurement is, of course, the type where the applicant for citizenship has falsified his identity or his precise foreign status, or other matters made a material part of his application and requiring the utmost good faith in their presentation. However, the application of the Act is by no means confined to such instances although it may be more difficult to apply the Act to cases, such as the present one, involving a determination of the applicant's state of mind at the time he was naturalized. And so there have been numerous decisions in various parts of the country revoking citizenship because of disloyalty to this country, proven, to the satisfaction of the particular court, to have existed at the time the particular applicant took the oath of allegiance and was admitted to citizenship. Most of these decisions, however, have had to do with clear cases of disloyal acts on the part of the defendants while this country was engaged in the last world war, or since the commencement of the present war. That is to say, although in many of these cases the instances of disloyalty upon which revocation of citizenship was predicated took place a number of years after the granting of citizenship, these instances all occurred about or during the time when our country was at war, and clearly indicated sympathy for, if not, in fact, the actual giving of aid and comfort to our enemies. See, for example, United States v. Wursterbarth, D.C., 249 F. 908; United States v. Kramer, 5 Cir., 262 F. 395; Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182; United States v. Herberger, D.C., 272 F. 278; United States v. Mickley, D.C., 44 F.Supp. 735. See also United States v. Baumgartner, D.C. Western Dist. of Mo., Western Div., 47 F.Supp. 622, decided November 11, 1942,

and United States v. Bergmann, D.C., Southern Dist. of California, Central Division, 47 F.Supp. 765, decided November 23, 1942. I do not question the correctness of these decisions.

In United States v. Kramer, supra, it was said page 397 of 262 F.:

"In the nature of things it is impossible for the government to make more than a cursory examination into the loyalty or the general character of the applicant for citizenship before admission, and the court must of necessity rely upon the good faith and truthfulness of the applicant when appearing before it and taking the oath of allegiance. In a criminal case, a man's intention may be judged by his acts. A conspiracy to defraud is usually proven by showing what the defendants did after the date upon which the conspiracy is alleged to have been formed, and the jury may consider such evidence in opposition to the testimony of defendant on the question of intention, and render a verdict of guilty upon it. Why not the same rule in a suit to cancel a certificate of naturalization?

"American citizenship is a priceless possession, and one who seeks it by naturalization must do so in entire good faith, without any mental reservation whatever, and with the complete intention of yielding his absolute loyalty and allegiance to the country of his adoption. If he does not, he is guilty of fraud in obtaining his certificate of citizenship.

"There can be no doubt that, had the defendant in this case been guilty of the utterances with which he is charged before his naturalization, and that fact had been known to the court, he would not have been admitted. The proof makes out a prima facie case of the disloyalty of the defendant, and shows his continuing allegiance to the German emperor."

While the type of case from which we have just quoted is more common and easier of solution, it does not, of course, follow, as we have already pointed out, that merely because this country may not have been at war when one is alleged to have conducted himself in a disloyal manner or to have made disloyal utterances, such is, in and of itself, conclusive of the impossibility or improbability of disloyalty having existed at the time of naturalization, even though the latter took place a number of years previously. Indeed, it may truthfully be said that fear of apprehension and of the dire consequences incident to disloyalty during war time might well deter and drive to cover one who, prior to such time, was more unguarded in what he might say or do. However, we have no right to cancel citizenship upon mere speculation. There must be satisfactory proof of fraud or illegality at the time citizenship was granted because, as the statute now reads, it is only in such instances that citizenship can be taken away.

In United States v. Woerndle, 288 F. 47, a decision of the Circuit Court of Appeals for the Ninth Circuit in 1923, a German-born person became a naturalized American citizen in 1904. There was no evidence of disloyalty or divided allegiance from 1897, when this person came to the United States, up to the time he was naturalized, nor thereafter until about 1914, when he showed deep sympathy for Germany and hostility toward her enemies. However, from the time when the United States entered the war in 1917, there was no evidence of any disloyal utterances or acts on his part. Prior to 1917 this person, by fraudulent means, had even assisted a German national to return to Germany. Nevertheless, the court refused to cancel this person's citizenship, and said (page 49 of 288 F.): "Citizenship, once bestowed upon proceedings in the federal courts, should not be lightly taken away. The evidence that the applicant, while taking the oath of allegiance, still retained in his heart a fraudulently concealed and stronger allegiance to another country, should be more clear and convincing than it is in the present case."

Again, in 1927, in Rowan v. United States, 18 F.2d 246, the same Circuit Court of Appeals had before it the case of a former subject of Great Britain, who had been naturalized in 1907, had been convicted in 1917, while we were at war, of violating the Espionage Act, 50 U.S.C.A. § 31 et seq., and sentenced to imprisonment and, as a member of the I.W.W., had otherwise opposed the prosecution of the war, including opposition to the draft law and advocacy of sabotage, all of which indicated that during the last world war he was opposed to organized government in the United States, and therefore was not attached to the principles of the Constitution, nor well disposed to the good order

and happiness of the country. However, the court refused to cancel the certificate of naturalization, and said (page 248 of 18 F.2d): "The situation may be summed up in this way: There is no possible suggestion that during the first five years after Rowan was naturalized he did any act or spoke any word tending in any way to show lack of full allegiance to the Constitution or to organized government. It happened that after five years he joined the labor organization that advocated mass unionism, based upon the principle that 'the working class and the employing class have nothing in common.' He continued to be a member of that organization, but aside from that fact there is nothing in the record to show that prior to 1917 he committed any act of disloyalty, or was in any way opposed to the government of the United States. To say that one who was not a member of such an organization in 1907, by merely joining the organization in 1912 and remaining a member through 1917, must in 1907 have been opposed to organized government, or been lacking in allegiance, is far too conjectural. Nor do we think that the proven fact that 10 years after 1907 Rowan was guilty of violation of the Espionage Act is logically probative of his state of mind in 1907."

Is there, then, evidence in the present case which goes beyond mere speculation that Albert Erfried Polzin in February, 1934, was not unqualifiedly loyal to this country, and that when he recited the oath of such loyalty, he had a mental reservation and was, in fact, retaining an allegiance to Germany? We do not feel that the proof is sufficient to support such a conclusion in the light of all the existing circumstances, and with due regard for the fact that, as has been pointed out, this defendant, following his return from Germany in the summer of 1934, had unquestionably become inoculated with Nazi ideas, had become an admirer of Hitler and his sinister teachings and activities, and in fact admitted that he prided himself upon being a believer in the Nazi fanatical doctrines. But Hitler did not come into power in Germany until January, 1933. It was not until some time thereafter that the insidious methods of the Nazi Party began to assert themselves in this country, through their multifarious secret agencies and groups that began gnawing at the very vitals of America, on the fanatical basis of German racial superiority, and that once a German always a German, regardless of foreign residence or citizenship. Thus, it seems more reasonable to assume, in the absence of any actual word or deed to the contrary, that Polzin started on his downward, disloyal path not earlier than the time that he made up his mind to take a trip to Germany, and perhaps not until after he had done so. What he might have done, or what, in fact, he actually did of a disloyal character prior to the summer of 1934, when he went to Germany, remains, so far as the record in the present case is concerned, a matter for speculation. It may well be, as the Government contends, that disloyalty was present, but remained undisclosed for want of an adequate opportunity for expression through local subversive organizations which, as we have seen, had not yet come into existence in Baltimore. But to say that such was the case is to speculate to a degree that we feel unjustified in doing.

Looking back upon what was allowed to be planted and to flourish in this country under the guise of liberty and freedom of speech in the nature of German propaganda and indeed actual criminal activities from about 1935 until the actual commencement of war, makes one ashamed of our inherent national weakness and hypocrisy,—ashamed of the intellectual dishonesty which was so wide spread. It was during this period, not before and not since, according to the record in this case, that Polzin engaged in his subversive practices and utterances. They require the most emphatic condemnation, but, on the record, were so timed as not to make it possible to apply to his case the statute upon which the Government relies, and must rely, for cancellation of his citizenship. What, by his own admissions, Polzin did, during the period just referred to, undoubtedly stamps him as having been during that time a very bad, if not, in fact, dangerous, person. There is much indication from the evidence in the case that his influence may still be detrimental or indeed dangerous to our Government's prosecution of the war. It is of such stuff that treason is made. This is no time for maudlin sentimentality for the enemy in our midst, who stealthily sows the invisible seed of sedition throughout the land. Therefore, neither our conclusion, nor anything contained in this opinion, is intended to be construed as in

any sense an abridgment of such right as the Army may have, under its very broad military powers and in the exercise of its discretion in the public interest, to require Polzin to take up residence and seek employment outside of any particular part of the country which has been, or may hereafter be declared to be a military area, and in which Polzin now resides, or may hereafter reside or work. Such authority on the part of the military establishment unquestionably exists with respect to all persons, whether they be citizens or aliens, in time of war, and is defined in certain laws and regulations passed pursuant thereto by both the civil and military authorities, to which we, however, need not specifically refer at this time.

Finally, it seems not inappropriate to observe that the statute under which this suit was brought provides that if a naturalized citizen returns to his native country, or goes to any other foreign country and takes up permanent residence therein within five years after his certificate of American citizenship is issued to him, such shall be prima facie evidence of lack of intention to become a permanent American citizen at the time of his application, and in the absence of counter-vailing evidence, shall be ground for cancellation of his citizenship. Thus, since mere removal raises a presumption against the necessary intent having existed at the time of admission to citizenship, there would seem to be even more reason for raising such a presumption by prescribing a similar rule of evidence that would be applicable to cases such as the present one; that is to say, since change of allegiance implies change of a most fundamental sort; and since loyalty or allegiance to be complete,—totally devoid of any mental reservation,—is usually of rather slow, gradual growth, it is inherent in the very nature of things that only a limited knowledge can, in most cases, be acquired of the applicant for citizenship during a probationary period prior to his admission; and, therefore, the present law would seem to be lacking in effectiveness by not raising the same prima facie presumption, or, in other words, by not placing upon the new citizen the same burden with respect to disloyal acts or utterances occurring within a reasonably long period after, as well as before admission to citizenship. But, for the reasons just given, the Government's bill of complaint must be dismissed in the present case, and it will be so ordered.