## UNITED STATES v. JOGWICK.

### No. 33–F.

District Court, N. D. West Virginia.

Aug. 24, 1943.

Joe V. Gibson, U. S. Atty., of Kingwood, W. Va., and C. Brooks Deveny, Asst. U.S. Atty., of Fairmont, W. Va., for the United States.

James F. Burns, of Fairmont, W. Va., for defendant.

HARRY E. WATKINS, District Judge.

This is a proceeding under Sec. 338 of the Nationality Code of 1940, 8 U.S.C.A. § 738, to cancel and set aside, on the ground of fraud, the certificate of naturalization issued to the defendant by this court on May 24, 1932.

The Government alleges in its complaint that the defendant, Walter Emil Albert Jogwick, filed his verified petition for naturalization on October 8, 1931; that he took the required oath of allegiance on May 24, 1932; and that, relying upon the truth and good faith of the representations of the defendant, as contained in his petition for naturalization and his oath of allegiance, the United States of America issued a certificate of naturalization to him.

It is alleged that, contrary to his representations and to his oath of allegiance, the defendant was "not in fact attached to the principles of the Constitution of the United States at the time of the filing thereof nor during the five years prior thereto; in that he did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to The German Reich, of which he was then a subject, but in fact intended to retain allegiance and fidelity to said The German Reich; and in that he did not in fact intend to reside permanently in the United States". And that "he did not in fact renounce and abjure all allegiance and fidelity to said The German Reich; in that he did not in fact intend to support the Constitution and laws of the United States of America against all enemies, foreign and domestic; and in that he did not in fact intend to bear true faith and allegiance to the same, but in fact did intend to remain a subject of The German Reich and maintain his allegiance thereto". The defendant has denied these allegations, and professed his loyalty to the United States.

 In order to decide this case it is necessary to determine the state of mind of the defendant on May 24, 1932, when he took the oath of allegiance. The burden of proof is upon the government, and it takes more than a mere preponderance of the evidence to establish the government's case. This is a case in which fraud is charged and such fraud must be established by clear and satisfactory proof. But it is well settled law that the state of a person's mind on a given date may be proved by his subsequent actions and statements. Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182, appeal dismissed 257 U.S. 621, 42 S.Ct. 185, 66 L.Ed. 401; Glaser v. United States, 7 Cir., 289 F. 255, certiorari denied 263 U.S. 700, 44 S.Ct. 6, 68 L.Ed. 513; United States v. Baumgartner, D.C., 47 F.Supp. 622; United States v. Bergmann, D.C., 47 F.Supp. 765; United States v. Schuchhardt, D.C., 49 F.Supp. 567; United States v. Kuhn, D.C., 49 F.Supp. 407; United States v. Polzin, D.C., 48 F. Supp. 476; United States v. Ebell, D.C., 44 F.Supp. 43; United States v. Meyer, D.C., 48 F.Supp. 926; United States v. Fischer, D.C., 48 F.Supp. 7; United States v. Murray, D.C., 48 F.Supp. 920; United States v. Wursterbarth, D.C., 249 F. 908, wherein a certificate of citizenship was cancelled after a lapse of more than 35 years; United States v. Wezel, D.C., 49

F.Supp. 16; United States v. Ritzen, D.C., 50 F.Supp. 301.

Walter. Emil Albert Jogwick, age 48, came to this country from Danzig with his wife in 1926 at the age of 31. He has a mother and six brothers in Germany, most of whom are now serving in the German army. He served in the German army during the first World War, and while in Danzig was a member of the Citizens Guard, a war veteran's organization, the members of which served as auxiliary police, helping to fight communism. This organization was active throughout Germany following the Treaty of Versailles, which was signed on June 28, 1919. Defendant admits that he has been bitter about the treatment Germany received in that treaty, which he terms "unjust", especially that part of it which took Danzig away from Germany, and believes that Germany was entitled to have back the territory which it lost in the last war, and is entitled to colonial possessions. When coming here he had the equivalent of a two year college education. He came to this country at the instance of a brother-in-law, who published a newspaper over here, printed in the German language. Both before and after coming here in 1926, defendant admits that he has been intensely interested in the internal affairs of Germany and has read all he could on this subject in newspapers and magazines. Nevertheless, he stated on direct examination that he had never even heard of Hitler or his theories until he became Chancellor of Germany in 1933. Adolph Hitler commenced his agitation for National Socialism in Germany immediately after the Treaty of Versailles. Defendant admitted on cross examination that he remembered hearing about the "Beer Hall Putsch" in Munich on November 9, 1923, when sixteen of Hitler's adherents were killed in one of his first efforts to obtain power. Hitler himself was imprisoned and remained in prison until December 20, 1924. He says that he never belonged to the German American Bund, was never asked to join, and never heard of the "Teutonia Society" or the "Friends of the Hitler Movement", names by which the National Socialistic movement was known here before it put Hitler into power in Germany.

He had not been in this country long until he found employment at a good salary. He became an active church member, purchased property and formed friendships. Two sons became citizens of this country by reason of their birth on American soil. The elder son was a Boy Scout, and defendant became active in this organization, often taking the boys on hikes. He contributed money to charitable and humanitarian organizations. It is only natural to assume that as the years passed the ties to his fatherland would become less binding and his loyalty and fidelity to this country would increase. United States v. Schuchhardt, supra; United States v. Kuhn, supra. After he was naturalized in 1932, nothing occurred to test his true feelings and loyalty to this country until about 1939, when Germany started on the march to regain territory which Hitler claimed had been unjustly taken away from them at Versailles.

Several witnesses, including fellow employes working in the same room with him, have testified to many anti-American statements made by him both before and after our entry into war with Germany. Some of these statements are admitted as true by defendant, with the explanation that he did not mean what he said, or had since changed his mind. Others are denied, but neither the explanations nor the denials are convincing to this court. Prior to Pearl Harbor he stated that he favored the German form of government and their philosophy of life; that if the United States entered the war, they had better put him in a concentration camp so he could not do any harm; that a man of his age should never migrate as it was impossible to get his native country out of his system, and that he made a mistake in coming over here; that he approved of German invasion of Poland, and admired Hitler; that he thought the German Empire should once more become a power and have the prestige it had before the last war; that our American boys were not physically fit and would make no capable opposition for Germans; that the culture of the German people was higher—we were used to jazz music and Hollywood. Between January 1 and June 1, 1942, after Pearl Harbor, and after we were at war with Germany, he stated that he wanted to make some improvements in the basement of his house so that he could sell his house easier, because, win or lose, he was going back to Germany with his family after the war; that America had done nothing for him; that he was not satisfied with conditions here; that he wished he was in Germany— he could do more good there than here;

that he would cheerfully give his right arm if he could be back in Germany to help; that under no conditions would he buy war bonds or stamps unless compelled to do so—that it would be like murdering his own people in Germany; that he could not sleep well on account of conditions in Germany, and wished he could do something to help them out; that the allies were dirty, yellow cowards—crude pioneers with no knowledge of the finer things in life; that we were nothing but a group of pie eating fools—and referred to our hillbillies who sat on the front porch eating peanuts; that he would be thrown in a penitentiary if people knew how he felt, and didn't care —because he saw no reason for covering up; that he was for Germany—he had always been on the winning side and intended to keep on the winning side; that Germany had never been defeated militarily, that we didn't win the last war— our soldiers were fighting high school boys and men two and three times wounded— that the German people back home were starved out; that the Allied Nations could not cope with Germany since they could not hold out against a handful of Japs; that he wanted to be put in a concentration camp so that he could hate freely. He referred to good war news as "Jewish propaganda", and on one occasion said: "Democracy! Bah!" He admits that since we have been in the war he has become angry when persons about him played "Praise the Lord and Pass the Ammunition" because he thought this sacrilegious. On one occasion a few months after Pearl Harbor a fellow employe stated "I would like to go out and kill a dozen Japs and a dozen Germans". Defendant admits that this made him angry, and explained: "I mentioned whether he intended to kill the dozen Japs and Germans with T-square and triangle". (Both men were employed in the drafting department.) He explains his anger by saying that he thought the statement unnecessary and exhibited "brutality", or words to that effect. As late as January, 1943, defendant admits he told a deputy clerk of this court that he did not want to see Germany lose the war. He seeks to justify or explain many of these statements by saying that he was angered because a camera in his home had to be given up, a radio in his home was checked up for short wave, and he felt he had little freedom. (It appeared that such action was taken under governmental regulations because his wife was still an enemy alien.) He says that he did not mean many of these things which he said in a half angry, have joking manner. The evidence does not show that these statements were made in the heat of passion and anger, or that defendant was "goaded" into making them. Defendant testified that they were made in ordinary daily discussions of the war news, and that many times he was the aggressor. Defendant says that he was provoked by several incidents at the office, but the incidents occurred before Pearl Harbor. He says that he is now sorry for these statements, and in the last few months has purchased $225 in war bonds, donated blood, and has contributed to the local war chest fund.

A common defense in cases of this type is that disloyalty proved to exist in subsequent years does not establish disloyalty at the date citizenship was granted. Defendant's own testimony has eliminated this defense. Defendant testified at the trial that his feelings, ideas, and loyalty to the United States were exactly the same when he took the oath of allegiance as when he made the statements in question; that whatever his feelings and loyalty were to either the United States or Germany in 1942, the same feelings and loyalty prevailed when he took his oath of allegiance, because his feelings have not changed. Similar admissions were held to have the same effect in United States v. Baumgartner, D.C., 47 F.Supp. 622.

These statements were made from day to day in that very dark and critical period in our national history, immediately following Pearl Harbor, when the war seemed to be going well for the Axis powers, when Germany was marching through Africa, and Japan was scoring one spectacular victory after another in the Far East, when the welfare and safety of our nation and the destiny of democracy itself, hung in the balance. These were times which tested the loyalty of every citizen as that loyalty had never been tested before. These were days so critical and the feelings were so tense that it would be difficult for anyone to conceal his true state of mind, should he try to do so. As was said in United States v. Herberger, D.C., 272 F. 278, 291: "Loyalty or allegiance is, necessarily, of slow growth; therefore, somewhat involuntary, not fully subject to the

will". These were days in which the danger to our national existence was so grave as to bring forth a deep desire on the part of every loyal citizen to do something to help defend our country against the enemy, as evidenced by the thousands of young men who waited in line to enlist for military service.

The stage setting was entirely different in 1932 when he took his oath of allegiance. Then we were at peace with Germany and there was no reason for defendant to believe that his love for his native land would ever conflict with his allegiance to this country. Perhaps he did not then realize how deep was his loyalty to his native land. It may not have occurred to him then that a man of his age who had fought with Germany in the last war should "never migrate". Very pertinent to this case is the language of the court in United States v. Herberger, supra, as follows: "Those who lightly, for temporary advantages, undertake to change their allegiance, are liable to overlook the deep-seated nature of this feeling; but the fact that not until afterwards, in times of stress, is it made manifest that the desires, suffered to lie dormant, are stronger for their native than their adopted country, although this fact may not be fully realized at the time of their naturalization, renders it none the less a legal fraud for the applicant to fail to disclose his true, although latent, feeling in such a matter."

From the time defendant became a citizen on May 24, 1932, up to the beginning of the present war, he had enjoyed the manifold privileges of citizenship, but nothing had happened to call forth a manifestation of his true feeling and state of mind. That test came when Germany and the United States declared war on each other. When that test came, defendant expressed his true feelings freely, day after day over a period of several months, feelings which existed at the time he became a citizen, but which lay dormant during intervening years. Those feelings flowed naturally from his mind in daily discussions of the war news with intimate associates. His feelings were so keen when Germany was winning that he could not suppress them.

It is easy to understand how a person might, on a single occasion, in the heat of argument, say something which he did not mean. In such event the natural thing would be for such person to correct that impression and make known his regret in having said it as soon as he had cooled off. But it is difficult to understand how a person would continue saying things which he did not mean day after day over a period of about six months, without any effort at correction.

Defendant says that after Pearl Harbor he suspected he was being observed, and that when he was talking to his fellow employes about the war he suspected that they were wanting to know his feelings. Under these circumstances there is every reason to believe that any loyal citizen would cease any further jesting, and would make no more statements for purposes of argument which indicated disloyalty. If misrepresentations are made under those circumstances, they would likely be to show more loyalty and not less loyalty than actually existed. Disregarding the gravity of the situation under which these statements were made, it is unreasonable to believe that one would make misrepresentations which he suspected would cause him trouble. Statements against interest are generally worthy of belief.

At the trial defendant referred to his heart being "torn in two" between the United States and Germany. In order to become a citizen he renounced *all* allegiance and fidelity to his homeland and agreed to support and defend the Constitution and our laws against *all* enemies, and his faith and allegiance were to be true. It was not intended that he should be denied the right of freedom of religion or freedom of speech, nor was it intended that he should give up all memories of his native land. This oath was exacted for the very purpose of precluding any divided loyalty. It was intended that his citizenship was to be full and complete without any mental reservation, and without retaining any allegiance to his homeland. It was intended that he should yield absolute loyalty and allegiance to the country of his adoption. United States v. Kuhn, D.C., 49 F.Supp. 407, 412. If he did not do so, he was guilty of fraud in obtaining his citizenship. United States v. Kramer, 5 Cir., 262 F. 395. Many of these instances occurred while we were at war with Germany, and clearly indicated sympathy for, if not in fact the actual giving of aid and comfort to the enemy. In this respect many of the cases cited by defendant, including United States v. Polzin,

D.C., 48 F.Supp. 476, where the statements were made prior to our entry into war, can be distinguished from the case at bar.

Defendant has introduced evidence to show that about October, 1942, he contributed to the county war chest fund; since March, 1943, members of his family have purchased $225 in war bonds; and in 1943 he has given and offered to give blood. It is significant that all of this belated display of loyalty occurred after June 16, 1942, when he had definitely learned that he was in trouble. Before that time the company employes had been solicited and were purchasing war bonds, but defendant had consistently said he would not buy bonds. He explained why he would not buy bonds, but in the light of other statements made by him, no explanation was necessary.

At the trial defendant expressed a willingness to purchase more bonds and to bear arms, if called, against Germany. He says that he likes this country and wants to make his permanent home here. These statements are far different than those which flowed so freely from him during April and May of 1942, when the Axis powers were victorious everywhere. Hitler and his adherents were preaching that we had entered the war too late, that final victory would come before we were prepared to fight effectively. Now the world picture has changed. As Germany's chances of victory have diminished, the future of Germany, home life there, and the benefits of German citizenship have diminished in attractiveness, while the real value of American citizenship has become more apparent. In our effort to reconcile any change in defendant in the past eighteen months, we must take into consideration the corresponding change in world conditions, and the pendency of this denaturalization proceeding.

A case very much in point is that of United States v. Herberger, D.C., 272 F. 278, 289, where the court said: "It may be that the defendant was in many respects an industrious and useful member of society; but that is not the question to be determined. It will be noted that there are no expressions in his letter or attributed to the defendant prior to the controversy having arisen showing any anxiety for the welfare of the United States or a desire for its success in the war. Taken at their face value, these expressions indicate more interest in the welfare of Germany than that of the United States, and nothing has appeared in this case to remove or alter such showing in any substantial respect. * * * While the defendant, Herberger, has not been shown to have done any overt act to further the hostile designs of Germany, nor counseled or advised the doing of such acts by others, his letter shows sympathy for Germany in the war, and that he himself was disloyal to this country. * * *" See also United States v. Woerndle, 9 Cir., 288 F. 47; United States v. Mickley, D.C., 44 F.Supp. 735.

■ There is no indication that defendant's statements were misunderstood. Many of the statements were heard by more than one witness. He repeated many of them to the agent of the Federal Bureau of Investigation when first questioned. He is an educated man, and showed at the trial unusual talent in finding the exact and grammatically correct words to express his thoughts. It is not the case of a poorly educated foreigner who was unable to make his thought clear because of educational or language limitations. The force of these statements is not overcome by the testimony of witnesses produced by the defendant, that, in their presence, he uttered loyal sentiments. It is only fair that proper allowance be made for any statements made in the heat of passion and that due allowance be made for statements which may have been provoked by others. Consideration should be given to the fact that defendant has enjoyed a splendid reputation and has never been arrested for the violation of any law. After giving due consideration to these factors, together with all the other evidence, including the demeanor and sincerity of the witnesses, I find that when defendant took his oath of allegiance in 1932 he did not in fact renounce all allegiance and fidelity to The German Reich, and did not in fact intend to support the Constitution and laws of the United States against all enemies, and did not in fact intend to bear true faith and allegiance to the same; that defendant was guilty of fraud in procuring his citizenship. The government is entitled to the relief asked. The certificate of citizenship should be cancelled. An order may be entered, (1) that the order of this court admitting Walter Emil Albert Jogwick to citizenship in the United States be, and it is cancelled and set aside; (2) that the certificate of naturalization granted him on May 24, 1932, is hereby cancelled; (3) that Walter Emil Albert Jogwick be, and he is hereby, directed to surrender his

certificate of naturalization to the clerk of this court; (4) that Walter Emil Albert Jogwick be, and he is forever restrained and enjoined from claiming any right, privilege, benefit or advantage whatsover under such certificate of naturalization; and (5) that the costs of this suit be, and they are hereby assessed against him.