## UNITED STATES v. WURZENBERGER.
### Civil Action No. 985.

District Court, D. Connecticut.

May 4, 1944.

Robert P. Butler, U. S. Dist. Atty., of Hartford, Conn., and Thomas J. Dodd, Jr., Sp. Asst. to Atty. Gen., for the Government.

Thomas R. FitzSimmons, of New Haven, Conn., for defendant.

SMITH, District Judge.

Defendant was born in Munich, Bavaria, Germany, in 1906. He came to this country in 1928 and has resided in the United States since that date with the exception of a period of four months in the year 1937, spent by him in a visit to Germany. He filed his declaration of intention May 7, 1932, in the Superior Court at Bridgeport, Connecticut, filed his petition for naturalization in that court on September 5, 1935, and was naturalized by decree of that court February 8, 1936. He sought naturalization because it was the conventional thing to do and because he thought he was required by law to do so. During the year 1935, defendant became interested in the activities of the German-American Bund, and traveled to meetings in New York on several occasions for the purpose of learning about its activities and program. A unit of the Bund was started in Stamford, Connecticut, in 1935 by the defendant and about five other men. In 1936, defendant was appointed as treasurer of the Stamford unit of the Bund, and continued to act as treasurer until at least sometime in late 1939, and continued thereafter, sporadically at least, to collect and forward some money to the national headquarters of the Bund as cashier of the Stamford unit, until June, 1941. The Stamford unit consisted of a maximum of approximately thirty-five members, but apparently lost membership and ceased to function as an effective organization some time after the conviction of national Bund leader Kuhn for misappropriating Bund funds. The defendant took part in numerous activities of the Bund, including collection of money for the sale of the Bund song books and other publications, for the so-called Winter Relief Fund, and the distribution of the Bund newspaper which was carried on by the defendant both at

Bund meetings in the hall of the Turner Liedertafel and at outdoor picnics. Defendant had in his possession a copy of "Mein Kampf", a German history, sketches of Hitler drawn or colored by defendant, a book by Goebbels, the Nazi Propaganda Minister, as well as various buttons designed for distribution to contributors to various activities of the Bund. Defendant attended several Bund meetings at Camp Nordland in New Jersey, Camp Siegfried on Long Island, and the Bund camp at Southbury, Connecticut. On several occasions, he attended meetings in New York in a makeshift uniform of the O.D., the strong arm group, organized to "protect" the meetings of the Bund against disturbance by hecklers. He also took part with others in an effort to organize a Bund unit at Norwalk, Connecticut. There is little direct evidence as to defendant's own interpretation of the policies and purposes of the Bund other than his statements to Lieutenant Helliwell during 1939 and 1940, which indicated that he believed that Hitler was a great leader of the German people, that his attacks on other nations were justified, and that his treatment of the Jews was necessary and proper.

On August 17, 1942, defendant was drafted into the army and has served, in this country, since that time. On two occasions, in interviews, he has expressed an unwillingness to fight against Germany, and on one of these occasions, an unwillingness to fight abroad at all. Aside from these statements, his service appears to have been satisfactory to his superiors, although at one time, in a letter to a friend, he indicated that he was becoming proficient on the rifle range, and intended to miss more often to avoid being made use of.

It sufficiently appears from the evidence that the Bund itself was an agency for the promotion in this country of the Nazi theories of leadership, blood, and race; that the following of these theories would necessarily involve a continued allegiance, by all those of German blood, to the German Reich and to Hitler. The spread of these theories among those of German blood was undoubtedly a part of the official propaganda policy of the German government during the period here involved, and German government officials cooperated in Bund meetings to assist in the spread of this propaganda, although

it may be said that there is, running through the evidence, an indication that the official German propaganda agencies at times distrusted the Bund leadership, perhaps fearing that the official position might be compromised by revelation of the undercover fifth column work of the experts by overenthusiastic and irresponsible amateurs. However this may be, there is no doubt that the national Bund leaders acted throughout from a purpose to assist the Nazis, first in their effort to control Germany and later in their program for world domination.

This purpose is plain enough from a review of the Bund's activities and propaganda. It was not, however, made plain, at least during the early years of this defendant's membership in the Bund, to all whose enlistment in the organization was sought. Claims of patriotic American purpose were put forth again and again, and unquestionably many members were obtained by playing upon sympathy for the Fatherland, under what was represented to be a Jewish-inspired and unwarranted boycott of all German industry in retaliation against allegedly justified measures taken to break an illegal control over German institutions by the Jews. This anti-Semitic poison was spread most assiduously by the Bund, and appears to have been the most frequently expressed purpose of this defendant in supporting the activities of the Bund.

The defendant's interest in the Bund started at about the same time as his petition for naturalization, and it is not possible to say at this time just how much of the Bund program had been made clear to him, either by the time of his petition or by the time of his admission to citizenship, since it appears that it was the practice of the Bund to draw members through bait and deception, to work on them gradually through repeated doses of propaganda, and to build upon race prejudice and vanity, following the pattern of the Nazi rise in Germany. Once in the Bund, and exposed to its spoken and printed propaganda for any considerable period, however, the purposes and intentions of the Bund must have been known to and joined in by the defendant.

Unfortunately, there are, in every country, many who are weak and susceptible to such a play upon passion and prejudice. We cannot, of course, because of their beliefs, deprive native-born Amer-

icans of citizenship, no matter how susceptible they may be to enlistment in such movements, nor can we deprive naturalized citizens of citizenship, solely because of such beliefs.

█ The question in this case, therefore, is not whether Nazi ideas are vicious, or whether the Bund promoted them, or whether the defendant eventually became a believer in and promoter of these vicious ideas, but whether we can determine by clear and convincing evidence, including evidence of his belief in and promotion of such ideas, what his state of mind was at the time of his naturalization or petition, or during the preceding five-year period, and whether this state of mind involved either fraud or the lack of a condition precedent to naturalization.

To this we have two guides: (1) His later statements about his state of mind at the time of petition and naturalization, that is, his purpose in becoming a citizen; and (2) the state of mind shown by his conduct then and later, particularly as a member and officer of the Bund, for its bearing on the state of mind existing at the critical times.

The evidence shows that a state of mind existed at those critical times which made his oath of renunciation and allegiance false, and makes it appear that the finding of attachment was erroneous. The oath was false and fraudulent in that defendant did not, in fact, renounce all allegiance to the German Reich. There must be something more than the recitation of the words. There must be a genuine breaking away from the old allegiance. The lack of such an intent, even though conscious purpose of deception may be lacking, is legal fraud. "No alien can take this oath with any mental reservation nor retain any allegiance or fidelity to his homeland, nor with any qualification agree to support and defend our Constitution and laws against all enemies, nor for any sentimental or other reason be unwilling to bear such true faith and allegiance, without being guilty of fraud." United States v. Kuhn, D.C.S.D.N.Y.1943, 49 F. Supp. 407, 411. See also United States v. Kramer, 5 Cir., 1919, 262 F. 395, 397; Schurman v. United States, 9 Cir., 1920, 264 F. 917, 18 A.L.R. 1182; Baumgartner v. United States, 8 Cir., 1943, 138 F.2d 29; United States v. Krause, 7 Cir., 1943, 136 F.2d 935; United States v. Jogwick, D.C. N.D.W.Va.1943, 51 F.Supp. 2.

The evidence is sufficient to show clearly and convincingly that defendant's renunciation of allegiance to the Reich and assumption of American citizenship was less than perfect. In addition to his own statements of his reasons for naturalization, a test of the extent of his renunciation and assumption of allegiance came in later years, and he then showed his divided allegiance in a number of ways, including his willingness to return to Germany and go into business there if his matrimonial venture in 1937 turned out successfully, and in his unwillingness, expressed in 1943, to fight against Germany and to carry on his military training wholeheartedly to prepare himself to do so. This divided allegiance is apparent in spite of the fact that, at times, he was willing to carry out at least some of his duties of citizenship, as when he failed to obey the Bund command to resist the draft, and, on a number of occasions, prior to the investigation in 1943, on his classification examinations at various military posts failed to indicate any unwillingness to fight, or to fight against Germany.

█ Insofar as we can determine from conduct what his state of mind was at the time of his declaration of intention and oath of allegiance, it appears that there was then a formal renunciation of allegiance and assumption of duties of citizenship, without willingness to carry out a complete renunciation and a complete assumption of allegiance to his new country. The new allegiance was taken on as a matter of convenience; the old remained. Attachment to a land which defendant had left after reaching his maturity outweighed his attachment to a new country in which he obtained naturalization as a matter of convenience, and caused his Bund activities and his lapses from full performance of his military duties as an American citizen. This later conduct does not stand alone as evidence of his state of mind at an earlier date, but is bolstered by defendant's own admissions as to his motives in applying for American citizenship, when defendant, on two occasions, stated the reasons for his naturalization as being, in substance, because he thought it was expected of him, and because he thought it was required by law after five years' residence. At the time of the investigation, those were the reasons which came to mind as his best recollection of his purpose in becoming a citizen. This is proof that he

was then falsely representing the renunciation and assumption of allegiance.

The question is, therefore, whether under the doctrine of the Schneiderman case (Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796) and its implications, such a state of mind is enough to support a revocation of the decree admitting the defendant to citizenship. In other words, if the applicant retains his old allegiance at the time of his declaration, of his petition, and at the time of his oath, does that state of mind, of itself, constitute fraud, or does it constitute a failure to fulfill a requirement of the Act which makes the naturalization illegal because the naturalization of a person who did not, in fact, fulfill the conditions upon which the decree could have been granted legally? I believe that it does both. See United States v. Kuhn, supra.

The Government has sustained its burden of proving by clear and convincing evidence that defendant, at the time of his petition, did not intend to absolutely renounce all allegiance to the German Reich and that he did not so renounce all allegiance at the time of his oath on admission to citizenship.

The proof which leads to these conclusions as to defendant's state of mind at the time of his petition and naturalization must also lead to a holding that the certificate of naturalization must be set aside, as illegally procured because the finding as to attachment was erroneous.

The Government has not shown by clear and convincing evidence that, at the time of his petition and for five years immediately prior thereto, the defendant held a general political philosophy fatally at variance with that of the Constitution. It has shown, however, as it failed to do in the Schneiderman case, that he was not attached to what must be considered one of its basic principles,—the necessity of undivided allegiance by a citizen to the nation. It can hardly be said that one who, at the time of naturalization, retains allegiance to another nation, even one of a similar general political philosophy, which the Germany of 1935 was not, is attached to the principles of our Constitution. If this is, as I believe, sufficient to show lack of attachment, the finding of attachment was erroneous, and the defendant failed to meet one of the statutory requirements for naturalization.

Judgment may be entered revoking the decree of naturalization and cancelling the certificate of naturalization in accordance with the prayers for relief in the Complaint herein.