## BAUMGARTNER v. UNITED STATES.

### No. 12525.

Circuit Court of Appeals, Eighth Circuit.

Sept. 11, 1943.

Writ of Certiorari Granted Jan. 17, 1944.

See 64 S.Ct. 485.

---

WOODROUGH, Circuit Judge, dissenting.

John Rhodes, of Kansas City, Mo. (Bowersock, Fizzell & Rhodes, of Kansas City, Mo., on the brief), for appellant.

Maurice M. Milligan, U. S. Atty., of Kansas City, Mo. (Richard K. Phelps, Asst. U. S. Atty., of Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

This is an appeal from a judgment of a federal district court setting aside a previous order of the court admitting the appellant, Carl Wilhelm Baumgartner, to citizenship, and cancelling his certificate of naturalization. The action is brought under the Nationality Act of 1940, 54 Stat. 1137, 1158, 8 U.S.C.A. § 738. The allegations of the complaint are that, at the time he took the oath of allegiance to this country, the appellant reserved his allegiance to the country of his birth, the German Reich, and did not in good faith renounce that allegiance nor assume, without reservation, the obligations and responsibilities of American citizenship.

The trial court found as a fact that at the time the appellant took the oath of allegiance to this country he accepted as sound and believed to be righteous the principles of government then advocated and thereafter put into practice by Adolph Hitler, and that his real loyalty was to those principles, which the court found to be diametrically opposed to those of the government of the United States. The court found that appellant's oath at the time of his naturalization that he renounced all fidelity to the German Reich and that he would bear true faith and allegiance to the Constitution and laws of the United States was falsely made. On these facts, the court concluded as a matter of law that the order admitting the appellant to citizenship and the certificate of citizenship granted him were obtained by fraud.

For reversal, the appellant contends that the court erred in the findings of fact and conclusions of law stated above.

Appellant was born in Germany on January 20, 1895. At the age of 19, after graduation from a German high school, he enlisted in the German army. He served on the western front in World War I, until his capture by the English in April 1917 after he had attained the rank of second lieutenant in the field artillery of the German army. Following his capture, he was taken to England where he remained a prisoner of war until 1919. On his return to Germany, he entered the University of Darmstadt, where he continued his studies until the summer of 1925, graduating with a degree equivalent to that of electrical engineer granted by American universities.

After his marriage in Germany in January, 1927, appellant came to this country, arriving at the port of New York on the 9th day of February, 1927, where he was lawfully admitted. On the 14th day of June, 1927, he executed his declaration of intention to become a citizen of the United States. On the 16th day of May, 1932, he filed his application for naturalization which was granted by a federal district court on the 26th day of September, 1932. The present proceeding was brought on the 21st day of August, 1942.

In August 1927 appellant was employed by the Kansas City Power and Light Company, and he has remained continuously in the employment of that company, residing in Kansas City, Missouri, where he was joined by his wife in September, 1927. Their three children were born in Kansas City. After her arrival in this country, appellant's wife filed a declaration of her intention to become a citizen, but never pursued the matter to a conclusion. At the time of the trial appellant's family was in Germany, where, appellant testified, they had gone for the purpose of visiting his wife's parents, intending to remain for a period of six months or one year. After their arrival in Germany, the present war began, and, although appellant's wife wished to return to this country, appellant concluded that his family would be as safe in Germany as here. Because of the dangers of the return trip, as well as because of the expense, they have never returned.

At the trial the Government offered the testimony of expert witnesses concerning the principles of government advocated and established in Germany under Adolph Hitler. No attempt was made by the appellant to deny the exposition of the philosophy of the government in force in Germany under Hitler and the National Socialist Party. The other evidence for the Government consisted of testimony of numerous acquaintances and associates of the appellant. The greater part of their testimony related to statements of appellant, hostile to this country and favorable to Germany, made throughout the period beginning after his naturalization and extending into the summer of 1941. There was also received in evidence a diary which appellant kept and in which he made frequent entries over a period beginning in 1938 and ending in July 1941.

According to the witnesses for the Government, appellant repeatedly expressed his disapproval of the manner in which the Government of this country was conducted. His immediate superior in the Kansas City Power and Light Company testified that within a day or two after appellant was employed by that concern he began to talk about Germany and the form of government existing there. This was in August 1927, years before appellant's naturalization. Appellant at that time expressed great admiration for and interest in the movement then represented by Hitler. His comparison of Germany and this country was so persistent and so unfavorable to the latter

that it was necessary to transfer him from the department in which he was originally employed to another, in order to avoid trouble with other employees.

When Poland was invaded by Germany, appellant declared that Germany was justified in the invasion as it was necessary to protect the Poles from England. He took the same position with reference to Belgium, Czechoslovakia, Austria, and Norway. He expressed the opinion that it would be better for the United States to be governed by Germany than by the English, under whose domination he insisted this country was. On one occasion, in 1938, he said that, if this country were run by Adolph Hitler, it would be a great deal better country. He said that there was no doubt but that Hitler would rule this country some day and make his home in New York. He maintained that regimentation under the Nazis was superior to democracy in this country. He ridiculed the American form of government and praised that in Germany under Hitler, declaring he was for Hitler 100 per cent. Expressing his opposition to the United States entering the war in Europe, he said it should make no difference to us in the final outcome if we were governed by Germany, as we would merely substitute that control for the control of the English, whose pawn this country was. He maintained that the democracies were on the way out. He said: "* * * look at the American Army, look at the German Army; we go places now and the day will come that Germany will be the dominant war power and then America has to listen to Hitler."

Appellant began keeping a diary on December 1, 1938, and the entries were made frequently until June 27, 1941. Some of the typical entries in the diary follow:

December 22, 1938: "The only ones who have any ideas here are the Jews and their ideas are vile, mean, and malicious." On the same day, he noted that the answer of the American Government to the German protest against what he called the "common insults" of Mr. Ickes was so arrogant and brazen that it must "make the United States more unpopular and despised, not only in Germany but in the entire world, than it already has been without this."

January 4, 1939: "The speech was a horrible mixture of war agitation and laughable talk about the freedom of press, speech, etc., which this country allegedly has and which has to be protected with guns." Appellant was referring to the

speech of the President of the United States delivered to the Congress.

February 14, 1939: "Today Zeglin came through Kansas City on his trip to the German Consulates in the West. He is attached to the Consulate General in New York now. * * * It is Zeglin's task to see that the Consulates prevent German citizens from joining political organizations." The proof shows that Zeglin was a representative of the German government under Hitler. Appellant met him on a visit to Kansas City and spent the evening with him and took him to the bus station on his departure.

February 25, 1939, referring to a meeting of German-Americans which he attended: "This Mr. Lagna opened the meeting with the German national anthem, whereupon everyone naturally arose and assumed the usual German stance with the arm extended to give the National Socialist greeting."

March 2, 1939, the appellant attended a meeting in Kansas City. An assistant to the United States District Attorney was among those present. Appellant wrote in his diary with reference to this attorney: "I think this fellow is a spy who tells the authorities everything that is going on in German American circles and who has set himself the task of seeing to it that the German herd of people continues to travel in the right direction." There are numerous entries in the diary in which appellant expressed the belief that persons attending meetings of German-American citizens were spies. In referring to the same attorney following another meeting of a German-American society, appellant noted in his diary that the district attorney "came out openly against Germany." Later he wrote that he had joined an association of all local German-American societies in order to keep a closer watch on this employee of the Department of Justice.

March 15, 1939, following the seizure of Czechoslovakia by the Germans under Hitler: "The Jewish-American-English fortress in the heart of Central Europe has fallen. A terrible defeat for the above named powers who will probably have a difficult time recovering from this." And on February 19, 1939, referring to the same incident, appellant said: "The English-American Jewry has had its trump card turned up, and its main trump has been taken away." Of one of his German-American acquaintances, he wrote in his diary on March 29, 1939, he "is a good fellow and a good German who has not been Americanized, that is, ruined."

April 22, 1939, he entered in his diary the following comment concerning a speech of a German student: "One cannot blame him for being so enthusiastic about the new Germany and for speaking so disdainfully about America in spite of the fact that he is probably acting contrary to instructions." April 28, 1939: "Got up at 4:30 to hear Hitler's speech. There are no words to describe how wonderful it was." September 3, 1939: "The German short wave station is a blessing." November 14, 1939: "Stayed home in the evening to enjoy my German short wave set. The subject was Soldier-Comrades, and the reception was excellent." January 16, 1940: "I also received three copies of 'The Case for Germany' today."

June 25, 1940, after an acquaintance had showed appellant her Red Cross button received for her donation, the appellant wrote: "This is a fund which is intended exclusively for England and the Jews and, therefore, against Germany. Comment superfluous." July 27, 1940, appellant again noted in his diary his surprise at the reactions of a German-American family to world events. He concluded with this note: "Even Helen Eyssell, to whom I always thought Germany meant more than just an entertaining place to stay, today made it very evident that she was an 'American' girl." And concerning another family of German Americans, on November 18, 1940, his diary carried the following entry: "They really feel at home in this country just like all other people of their type." December 31, 1940: "Hitler's speech, the New Year's address to the German people, was an effective answer to Roosevelt's false and twisted statements." In connection with Yugoslavia's entrance into the three-power pact in Vienna, the diary on March 25, 1941, contained this comment: "The rage of the English and the 'Americans' knows no bounds", and concluded, "Well, these gentlemen will probably have to suffer more attacks of rage before they finally realize that the world has already passed them by." May 4, 1941: "Listened to Hitler's speech * * *. It was wonderful as usual. The idea of the whole speech was 'nothing is impossible for the German soldiers.'" May 27, 1941: "* * * we listened to Roose-

velt who made another crazy and abusive speech against Germany and the Axis powers in general."

As early as December 1, 1938, it appears from appellant's diary that he was influential in preventing the Steuben Society, an organization of German-Americans, to which he belonged, from protesting against the persecution of Jews in Germany. He was of the opinion that things happening in this country were "a thousand times worse" than the so-called persecution of Jews in Germany. The diary contains frequent expressions of appellant's animosity to the Jewish race. The idea that the German treatment of the Jews was right and justified was expressed more than once. February 6, 1939, the entry in the diary reveals that he had met a German-American citizen, who expressed his disapproval of the treatment of the Jews in Germany. Appellant noted: "It is difficult for me to overcome my antipathy for this man. * * * With respect to world events he is so naively egotistical that events in Germany which appear to threaten his safety and comfort here in the United States, even to the slightest extent, are most sharply criticized by him."

December 11, 1939, the appellant noted in his diary that he stayed home to read two books, one from Germany, and the other from the German Library of Information in New York.

Appellant denied categorically that he made statements showing disloyalty to this country. He attempted to explain the entries in his diary which he could not deny. The diary had been kept in the German language. Appellant contended that the translations given in evidence were not always accurate and did not truly express the real thought written by him in the German language. Concerning some of the entries which could not be explained, appellant said that they were the result of his understanding of events at the time he wrote them. He admitted that many of the conclusions expressed in his diary were mistaken, if the information on which they were based was erroneous. With reference to some of the entries, his explanation amounted to nothing more than a retraction. He asserted that he had been misquoted or misunderstood by many of the witnesses who testified against him. He admitted that he retained a deep affection for the land of his birth. He insisted that the true intent of his statements concerning Germany and

Hitler was not to indicate a want of allegiance to the United States, but to express his fervent wish that Germany might become again a prosperous and respected nation. He recalled the days of his youth in Germany before the first World War as a golden age, the happiest days of his life. The terrible economic conditions which prevailed in Germany following the Treaty of Versailles made a deep impression upon him. The information which came to him was that Adolph Hitler had succeeded in leading the German people out of these difficulties and establishing a stable government. On that premise, he thought Hitler worthy of his admiration, as well as the admiration of all other people. He insisted that he took the oath of allegiance to this country with full understanding of what he was doing, without any reservation whatever, and that, since he took the oath, he had, in his own estimation, been a loyal citizen of this country, willing, if called by the military, to take up arms against the German nation. He said that following the declaration of war by this country he reversed his attitude and urged full support of the United States by all naturalized citizens. Seven acquaintances of appellant testified that he was a man of good moral character, and, as far as their observation went, a good citizen.

An order of naturalization of an alien is a judgment and, like other judgments of courts of record, is not lightly to be set aside. Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738; Schneiderman v. United States, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796. But a judgment of naturalization differs from the common run of judgments in that it is not one vindicating an existing right, but a judgment granting a right which did not exist prior to its pronouncement, and which the court had no power to grant except upon full and complete compliance by the alien with every condition imposed by the act authorizing the grant. The principles of res adjudicata do not apply, therefore, as against the statutory provision for review and revocation of a judgment of naturalization. Maney v. United States, 278 U.S. 17, 22, 23, 49 S.Ct. 15, 73 L.Ed. 156.

The duty of full compliance with every condition precedent to the right of naturalization rests upon the alien applicant and upon no one else. If one requirement for naturalization is more important than another, it is the requirement of an allegi-

ance to this country at the time of naturalization which is full and complete and without reservation. What that allegiance is, only the alien can know, but he is bound to know. The great importance of the proceeding to the United States and the fact that only the alien can know what his real allegiance to this country is compel the conclusion that, if the alien mistakenly swears to an allegiance which he does not possess or which perhaps, for reasons overlooked by or unknown to him at the time of his naturalization, he can never possess, he has failed to satisfy this requirement for his admission to citizenship. It is the fact of the alien's allegiance to this country at the moment of naturalization and not his belief concerning it upon which the right to naturalization depends. Schwinn v. United States, 9 Cir., 112 F.2d 74, affirmed 311 U.S. 616, 61 S.Ct. 70, 85 L.Ed. 390; United States v. Zgrebec, D.C., 38 F.Supp. 127; United States v. Moskowitz, 39 F. Supp. 989; United States v. Herberger, D. C., 272 F. 278; United States v. Mickley, D.C., 44 F.Supp. 735.

■ In an action to vacate a judgment of naturalization on the ground that it was obtained by fraud, the burden is upon the United States to prove the charges of its complaint by evidence which is unequivocal, clear, and convincing. There are cases holding that the United States must prove the fraud charge virtually beyond a reasonable doubt. United States v. Sharrock, D.C., 276 F. 30. Fraud is never presumed, and a judgment is attended by a presumption of validity. But such a proceeding is civil and not criminal in character, and, where fraud is charged by reason of the falsity of an alien's oath of allegiance, it is not necessary in order for the Government to prevail that it prove the defendant guilty of the crime of perjury or sustain the charge by the weight of evidence required in such cases. Later cases sustain the rule that it is sufficient if the Government sustains its charges by a clear preponderance of convincing evidence. United States v. Rovin, D.C., 12 F.2d 942; United States v. Zgrebec, supra; United States v. Marafioti, D.C., 43 F. Supp. 45; United States v. Der Manelian, D.C., 39 F.Supp. 959; United States v. Ebell, D.C., 44 F.Supp. 43; and see Schneiderman v. United States, supra, where the charge was not fraud but that the judgment of naturalization had been illegally procured.

■ The narrow question of fact in the present suit is whether appellant's allegiance to this country at the time of his naturalization was unqualified and unconditional, or, stated another way, it is whether his oath of allegiance was made without any mental reservation whatsoever in favor of the country of his origin, the German Reich. That the question is one of fact can not be doubted. United States v. Krause, 7 Cir., 136 F.2d 935, decided June 30, 1943; Turlej v. United States, 8 Cir., 31 F.2d 696; Schneiderman v. United States, supra; United States v. Rovin, supra; United States v. Kuhn, D.C., 49 F.Supp. 407. The finding of the trial judge upon the question of fact presented is conclusive on this court unless clearly erroneous. Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

■ The weight of authority sustains the proposition that the falsity of an oath of allegiance or the absence of unqualified allegiance to the United States on the part of an applicant for naturalization may be established by proof of acts and declarations subsequent to the taking of the oath. Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182; United States v. Tapolcsanyi, 3 Cir., 40 F.2d 255; Glaser v. United States, 7 Cir., 289 F. 255; United States v. Kramer, 5 Cir., 262 F. 395; Turlej v. United States, supra; United States v. Krause, supra; Schneiderman v. United States, 9 Cir., 119 F.2d 500; United States v. Ebell, supra; United States v. Mickley, supra; United States v. Kuhn, supra. And it has been held that since the real facts concerning the alien's state of mind at the time of his naturalization are exclusively within his possession and knowledge, the burden shifts to him, upon proof of acts and declarations subsequent to naturalization which justify the strong inference of disloyalty at the time of naturalization. United States v. Wursterbarth, D.C., 249 F. 908.

■ Testing the evidence in the light of the authorities which we have discussed, we can not say that the finding of the trial judge that appellant at the time of his naturalization falsely swore to an allegiance to this country which he did not possess is clearly erroneous. The evidence of those who testified for the appellant is of little or no probative value on the question of fraud in his oath of allegiance at the time of his naturalization. Good moral

character is not inconsistent with loyalty to the German Reich, nor with the commission of fraud by appellant within the meaning of the act upon which this proceeding is based. Appellant was the only material witness for himself, and his testimony on the witness stand is in conflict not only with that of numerous witnesses who testified against him, but with many of the statements in his diary.

As a naturalized citizen appellant had the right to oppose the entry of this country into the war against Germany. He had the right to criticise the course pursued by the government of this country with reference to the war in Europe, if he thought that course was wrong or inimicable to the best interests of this country. Naturalization did not require that appellant surrender his interest in the welfare of his native land, but it did demand that he hold the welfare of his adopted country first. The record before us is as remarkable for its silence concerning any expression by appellant of interest in the welfare of the United States as it is for appellant's declarations on behalf of the German Reich.

Appellant testified that he came to this country because of the terrible inflation prevailing in Germany and because of his inability to earn a living there. He came to this country, by his own testimony, because of the hope that here he could find a place in which to live and earn a living. His hopes were not disappointed. Almost immediately upon his arrival he secured employment for which he was fitted by education and training. He made fair progress in his work and attained a position of comparative prosperity, which, according to his own testimony, would have been impossible of attainment in his native land. He was able to bring over his wife whom he had left in Germany. Here he made his home and reared his family. In such circumstances it would be reasonable to suppose that in a diary which he kept for the purpose of recording his real thoughts concerning events of importance in his life, he should at some time have noted his progress in the land of his adoption and expressed his satisfaction with it. But nowhere did he mention the United States except to criticise or denounce it. One can not escape the conclusion that the judgments he recorded on world events were not based upon any patriotic desire for the welfare of the United States, but were based exclusively upon an allegiance

to his native land which it was impossible for him to surrender. Almost on the eve of the registration of the young men of this country for military service under the Selective Service Act of 1940, 50 U.S.C.A. Appendix, § 301 et seq., appellant was declaring with apparent satisfaction that Germany would soon be the world's dominant military power and that this country would have to listen to Hitler. And while citizens of the United States, naturalized and native born, were contributing to the Red Cross for the aid of its citizen-army, appellant was denouncing these contributions on the ground that the money realized was to be used against Germany. That it was also to be used in the interest of the United States was a matter of no moment. And, although this case was tried long after the declaration of war between this country and Germany, no evidence was offered at the trial to show that after that declaration appellant at any time expressed the hope that the United States might prevail or that he made any tangible contribution of any kind or character towards the promotion of the war effort.

The trial judge was not compelled to accept as true the appellant's profession of loyalty to this country. We are admonished by Rule 52 of the Rules of Civil Procedure that, in reviewing a finding of fact made by a trial judge, we must give due weight to the opportunity afforded him of judging the credibility of the witnesses. The appellant was not an ignorant immigrant, confused and helpless at his trial. He was a man of more than average education and more than ordinary intelligence, represented by able counsel. The opportunity which the trial judge had to observe him on the witness stand was of peculiar importance in a case of this character where, in the final analysis, the question of fact depended so completely on appellant's knowledge and appellant's testimony.

The judgment appealed from is affirmed.

WOODROUGH, Circuit Judge (dissenting).

I am convinced that the German-born citizen whose appeal is now before us has been deprived of his citizenship, branded an enemy alien and condemned to internment for the sole and only reason that he dared, before Pearl Harbor, to exercise the freedom of speech guaranteed him by the first

amendment to the Constitution of the United States. The agents of the government devised and prosecuted these proceedings against him solely because of the words, objectionable to administrative opinion, which he then spoke on matters of public interest, and the only testimony they adduced against him consisted of those words spoken or written in his private diary. He believed before Pearl Harbor, as he said, "that it was not good for this country to go to war," and so believing, he spoke in support of that belief—as he had a constitutional right to do in free America.

I believe that constitutional guarantee is not so frail a safeguard that it can be gotten around and destroyed by administrative ingenuity. Surely not by merely casting an attack in court against the man that exercises it in a particular form, or calling the proceedings "equitable". The form of action resorted to in this case to destroy this appellant for speaking out his mind on public questions, and its sufficiency to that end, have been defended with subtle and ingenious arguments, but I am satisfied they are fallacious. The gist, as I see it, is that in actions in this form the "allegiance" of the accused is an issue of fact, and that means, as I take it, the federal district judges have power to look into the utterances of foreign-born citizens arguing public questions to decide as "fact" whether they are true believers in Americanism or tainted with heresy in that field. That is to say, that the judges have the same inquisitorial power over the minds of foreign-born citizens in matters political that the Spanish Inquisition had over the human mind in religion. I deny it.

It matters not what foreign country may be interested in a public question being debated before our people. Our constitutional guarantee maintains inviolate the right of every man to have his say about the public question notwithstanding. That guarantee is the firm rock and foundation on which liberty and freedom in this country are anchored, and it is the duty of every agency of government to defend it. Most of all the judiciary. I like the words in which this appellant exercised his right to speak on the supreme question before the country prior to Pearl Harbor no better than my fellow judges in this case have liked them. I am opposed to, and find it hard to restrain my words against the use that has been made of his spoken words to destroy him.

I think the inquisition which the trial court made into the words spoken by this appellant on the public issue invaded the man's constitutional immunity. The provision reads: "Congress shall make no law * * * abridging the freedom of speech," and congress has never attempted to abridge the freedom of speech of naturalized citizens. The courts are equally bound. They exercise their powers through lawful forms of procedure sanctioned by them. If they sanction a procedure to punish a man for speaking his mind on public questions, they unlawfully abridge his freedom of speech. The lawful powers they have in denaturalization proceedings need not be detailed. Such powers can not lawfully be stretched against the Constitution to abridge freedom of speech. In my judgment that is precisely and exactly what has erroneously been done in this case.

The grimness of war hardens us all and we lean to harshness. Maybe normally the fact that this foreign-born appellant took to observing public men and affairs and to thinking about them, and dared to speak out what he thought, shows Americanization at work in him. He probably wasn't raised that way. Maybe he used to step from the sidewalk and take off his hat to officials. Most likely something changed him before he got to talking that way about the President and how rotten the country's run, and about perfections over there. Of course he had no skill at it. His line of talk was weak. It didn't endanger the country. The zeal to destroy him on account of his speaking was excessive and the record of the trial smacks of hysteria. The trial judge's opinion might even be taken to imply that be believed the appellant to have been generally in favor of putting torches to cathedrals, synagogues, churches, libraries and books; and torture, robbery and murder in cold blood. Not apparently of practicing witchcraft.

After Pearl Harbor appellant was all for our successful conduct of the war and he swears that he is ready and willing to bear arms for this country against Germany or any other enemy. There's no question of his honesty. What I believe to have been mistaken busyness of so many of us noncombatants about mere words spoken in this country of free speech has cost us a soldier, besides breaching the good faith of our country pledged in its grant of citizenship, with all the rights and immunities thereof, to this appellant.