**UNITED STATES v. GALLUCCI.**
Civil Action No. 2355.

District Court, D. Massachusetts.
March 21, 1944.

Edmund J. Brandon, U. S. Atty., and Edward D. Hassan, Asst. U. S. Atty., both of Boston, Mass., for plaintiff.

Thomas C. O'Brien and John S. Stone, both of Boston, Mass., for defendant.

FORD, District Judge.

This proceeding to cancel Certificate of Naturalization Number 4921912 issued on August 6, 1940, to the defendant, Francesco Paolo Gallucci, was begun on June 23, 1943, under the provisions of Sec. 338 of the Nationality Act of 1940, 54 Stat. 1137, 1158, 8 U.S.C.A., § 738.

The grounds assigned by the United States for revoking the decree and cancelling the certificate of naturalization are (1) that the representations made by defendant in his petition for naturalization were false and fraudulent in that he was not in fact attached to the principles of the Constitution of the United States at the time he filed said petition nor during the five previous years; (2) that he did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to Victor Emmanuel III, King of Italy, of whom he was then a subject; (3) that he did not in fact reside or intend to reside permanently in the United States, at the time he filed his petition for naturalization nor during the three years immediately prior thereto. The government further assigns that all the representations made by the defendant in his oath of allegiance were false and fraudulent in that (1) he did not in fact renounce and abjure all allegiance and fidelity to Victor Emmanuel III, King of Italy; (2) he did not in fact intend to support the Constitution and laws of the United States against all enemies, foreign and domestic; and he did not in fact intend to bear true faith and allegiance to the same, but did in fact intend to remain a subject of and maintain allegiance to Victor Emmanuel III, King of Italy.

The defendant's answer denies that any of the representations made by him either in his petition for naturalization or in his oath of allegiance were false or fraudulent. It sets up as matters of further defense a plea of res adjudicata and the unconstitutionality of certain sections of an Act of Congress, Act of June 29, 1906, c. 3592, §§ 15, 23, 34 Stat. 601, 603, as amended May 9, 1918, c. 69, § 1, 40 Stat. 544, not involved in this proceeding.

The undisputed data concerning defendant's general background and activities are as follows: Francesco Paolo Gallucci was born a subject of the Kingdom of Italy, in Naples, Italy, on March 19, 1903. He joined the Fascist Party of Italy in 1920, at the age of seventeen, and became a lieutenant in the Squadristi, an elite organization of Fascists who were affiliated with the party from 1919 to 1920. He was a member of the Squadristi at the time of the march on Rome in 1922 and admittedly a dues-paying member of the Fascist Party at least until 1933. On April 30, 1930, he was married to Josephine Nardi, a native born citizen of the United States, at Naples, Italy, where he continued to reside until his arrival with his wife at the port of New York, on October 28, 1933. From October 28, 1933, to the present time, defendant has continuously resided in Boston, Massachusetts, or its environs, with the exception of two periods from January 10, 1937, to March 25, 1937, and March 13 or 16, 1940, to July 23 or 25, 1940, during which he returned to Italy. Until 1937 or 1938, when he entered the radio advertising business the defendant was engaged in no gainful occupation in this country. He was, however, an organizer and charter member and has at all times been president of the Federazione Dopolavoro del Massachusetts, Inc. (hereinafter called the "Society"), which was comprised of a central organization with subsidiary chapters and which was incorporated under the laws of the State of Massachusetts, on October 16, 1936.

On March 7, 1940, the defendant filed petition for naturalization No. 209735 in this court. He took the prescribed oath of allegiance and was admitted to citizenship on August 6, 1940. On June 23, 1943, the government filed its complaint seeking revocation of the decree of naturalization, cancellation and surrender of the Certifi-

cate of Naturalization and seeking to enjoin the defendant from claiming any of the rights or privileges of citizenship accruing thereunder.

The charge against the defendant which the government has most clearly sustained is that although he declared (1) in a declaration of intention dated 1935,[1] (2) in a preliminary form for petition for naturalization, and (3) in his petition for naturalization, his intention to renounce absolutely and forever all allegiance to Victor Emmanuel III, King of Italy, and in his oath of allegiance swore to renounce entirely and to abjure all allegiance to the same monarch, the defendant fraudulently misrepresented an allegiance to the United States which he did not in fact entertain and fraudulently concealed his real allegiance to Italy.

■■■ There can be no doubt that the Act of 1906 under which the defendant Gallucci was naturalized contemplated an absolute and unconditional renunciation of his former allegiance and transfer of his allegiance to the United States. The first subdivision of section 4 of the Act of 1906, 34 Stat. 596, as amended, 45 Stat. 1545, 53 Stat. 843, required the applicant for citizenship in his declaration of intention to state under oath "that it is bona fide his intention to become a citizen of the United States, and to renounce forever all allegiance and fidelity to any foreign, prince, potentate, state, or sovereignty, and particularly, by name, to the prince, potentate, state, or sovereignty of which the alien may be at the time a citizen or subject". The second subdivision of section 4 of the 1906 Act required the applicant in his petition for naturalization to state his intention to renounce "all" his former allegiance "absolutely and forever". The third subdivision used the words "absolutely and entirely" and required him to declare on his oath in open court by way of additional emphasis that he "abjure" as well as renounce all former loyalties. Judicial decisions have supported the plain and obvious meaning of the words of the statute. One who seeks American citizenship by naturalization must do so without any mental reservation. If he does not do so he is guilty of fraud. United States v. Kramer, 262 F. 395, 397; United States v. Kuhn et al., D.C., 49 F.

Supp. 407, 411, 412; United States v. Mickley, D.C., 44 F.Supp. 735, 738.

■■■ Of course, Congress did not intend that the new citizen be required to renounce any sentimental fondness or affection he might have for his native land (United States v. Kuhn et al., supra, 49 F. Supp. at page 412), and in some cases the line between allegiance and affection may be difficult to draw. An important test, however, is the applicant's unreserved willingness (except for possible conscientious or religious scruples sanctioned by Congress, see United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302) to bear arms in support of his newly adopted country against the land of his origin. There is no question or contention here of a conscientious objection against the bearing of arms. When asked in his preliminary form for petition for naturalization: "If necessary, are you willing to take up arms in defense of this country?" defendant's answer was "yes." But in a signed statement voluntarily made to Agents of the Federal Bureau of Investigation on May 24, 1943, and affirmed in substance on the witness stand, Gallucci stated that he would do nothing to bring about the military defeat of Italy, that he could not fight against Italians in Italy because they are his race brothers, that he could not fight against Italians on Italian soil even though it might be felt that the defense of the United States required the invasion of Italy, that he could not say whether or not he would furnish to the United States Army any information he might happen to possess concerning Italy of military value to the United States. In May, 1943, three years after the defendant took the oath of allegiance, the United States and Italy were at war and yet the defendant stated: "I can no more decide whether I want Italy or the United States to win than I could decide between the death of my mother or my wife." These statements of qualification were made subsequent to the petition for naturalization and the oath of allegiance, but there is testimony by the defendant that he held the same sentiments as of August 6, 1940, and, as a matter of law, "the weight of authority sustains the proposition that the falsity of an oath of allegiance or the absence of unqualified allegiance to the

---

[1] This declaration of intention was in fact unnecessary as defendant was eligible for naturalization as an alien married to an American citizen without a declaration under Section 2 of the Act of September 22, 1922, 42 Stat. 1022, as amended.

United States on the part of an applicant for naturalization may be established by proof of acts and declarations subsequent to the taking of the oath." Baumgartner v. United States, 8 Cir., 138 F.2d 29, 34, and cases cited.

In addition to the best of willingness to bear arms in support of the United States, there are other tests of fidelity which the defendant Gallucci has clearly failed to meet.

Positive evidence that the defendant still retained his former loyalties not only before but after the naturalization proceedings indicates that United States citizenship was lightly and fraudulently assumed for merely temporary advantage. The record is replete with evidence of Gallucci's loyalty to Italy and Fascism both before and after August .6, 1940. This evidence will be classified into four different categories.

First. Gallucci was in constant touch with the office of the .Italian Consul in Boston at least from 1935 until the Consulate was closed in 1941. He admittedly visited the Consulate in person every month or every two weeks over this period of years and his secretary testified to an almost· daily telephone contact. In a letter dated April 23, 1940, this secretary, who was also a vice-president of the Society, stated that he considered a request by the Italian Consul as an order. Contrariwise, the Italian Consul exhorted the members of the Society "to obey President Franco Gallucci blindly." A Chancellor of the Italian Consulate and Secretary of the Italian Fascist Party in the Boston area, one Antonio Francalancia, sponsored the defendant as first president of the· Dopolavoro Society which both had originally organized. Francalancia was in charge and bore the title "Inspector" of the educational and school program of the Dopolavoro Society. The books used in the Dopolavoro schools were furnished free of charge from the office of the Italian Consul. Mario Conti, another employee of the Italian Consular office, was made chief of the press office of the Society. It was through Conti who wrote the commercials for an Italian radio program broadcast over Station WMEX that the defendant was introduced into the radio advertising business. After the Society was formed, the defendant made frequent reports of its activities to the Italian Consul for such purposes as disciplining a United States citizen who had quarreled with Gallucci concerning the operation of the Dopolavoro school, and to notify the Consul as to who would act as president of the Society during defendant's absence in Italy. In 1937 or 1938, Gallucci visited the Consul in an effort to obtain a pardon for one Salvatore Ingaglio, president of the Benito Mussolini Chapter of the Dopolavoro, who had been convicted of a crime in Italy. It is significant that Gallucci was the man chosen by Ingaglio to/ intercede for him with the Consul. When called upon to explain these singular actions, the defendant was unable to do so. The inescapable explanation, of course, is that those who were most concerned about and had the best means of testing his trustworthiness, viz., the Italian Consular officials, did trust his loyalty to Italy and the regime.

Second. Aside from the contact which Gallucci represented between the Dopolavoro Society and the Italian government, the very existence and operation of such a society as the record reveals this to have been, evidences his continuing loyalty to that government. Ostensibly organized as a good government society with social and educational aims, it was in fact a blind for the purpose of propagating Fascist ideology and disseminating Fascist propaganda among members of the Italian community in and about Boston. The theoretical principles and the practical activities of the Society were admittedly modelled after and inspired by a parent society in Italy organized by Mussolini in 1925 and characterized by Gallucci himself as a "Fascist organization." The progress of the Society was guided by Francalancia, the secretary of the Italian Fascist Party in the New England area, from its inception until he returned to Italy in the summer of 1941. Meetings of the Society were regularly opened with the Fascist salute, Fascist songs, such as the Giovinezza, were sung, and Fascist holidays, such as October 28, the date of the march on Rome, April 21, commemorating the legendary founding of the city of Rome, and May 9, the anniversary of the creation of the late Italian Empire, were observed and celebrated. Official correspondence of the Society was dated by the defendant in terms of the particular year of the Fascist era and closed with some such phrase as "Fascist greetings" or "We as Fascists greet you." The headquarters of the Society was decorated with an autographed picture of Mussolini and an official Fascist calendar. In 1939,

a number of the chapters of the Society received from Gallucci an autographed picture of himself dressed in the uniform of a lieutenant in the Fascist militia. The charters granted by the central Federation of the Dopolavoro to the individual chapters bore the Fascist emblems. On March 23, 1939, a telegram was sent to Mussolini and to Achilli Staraci, secretary of the Italian Fascist Party, in the name of the Federazione Dopolavoro. On October 12, 1940, Gallucci founded in the name of Italy as well as of the Federation Dopolavoro of Massachusetts a chapter of the Society comprised of the officers and crew of the Italian ship S. S. Dino then moored in Boston Harbor. Every Italian Consul who served in Boston during the existence of the Society was admitted to honorary membership and was invited to speak at meetings and celebrations of the Society where they exalted Italy and Fascism.

The Society sponsored a school system which gave instruction in the Italian language and in Italian history to young children. Defendant paid the salaries of the Dopolavoro school teachers on at least one occasion from his own personal funds. The photograph of Mussolini which hung on the wall of the Society headquarters was dedicated to the boys of the Italian schools.

Gallucci's office was also an outlet for the dissemination of Fascist propaganda writings to the more adult members of the Society. Books variously entitled: "Mussolini—An Outlook on Life," "Europe Cannot Die—The Foreign Policy of Mussolini," "Italy Under the Sign of the Lictors," "Roman Peace and Civil Progress in Redeemed Ethiopia," etc., were received by Gallucci from the Italian Consulate and distributed to directors of the different chapters of the Society. In a letter signed by the secretary of the Society, the Italian Consul General was asked to furnish the Dopolavoro with "other volumes so that we may better accomplish the work of our apostolate." The defendant represented that the Society in Massachusetts was recognized by and was a part of the parent Society in Italy and that special privileges in Italy were available to the membership. Although membership in the Fascist Party was apparently not a prerequisite to membership in the Massachusetts Dopolavoro, Gallucci's private secretary and vice-president of the Society testified that there were no anti-Fascists in the Society, because "an anti-Fascist would not associate with the Dopolavoro."

The facts are enough to show that the Federazione Dopolavoro del Massachusetts, Inc., which the defendant was instrumental in organizing and conducting, looked back to Italy rather than to the United States for its inspiration, its aims, and its guidance.

It is quite unbelievable that a man who when he filed a declaration of intention on April 5, 1935, sincerely declared his intention of renouncing allegiance to Italy and in 1940 sincerely swore that he had put off that allegiance and was ready to assume fidelity to the United States of America, would, in the intervening five years, redouble his efforts to organize and conduct a society whose paramount purpose was the perpetuation of Italian traditions, the strengthening of Italian loyalties and the dissemination of Fascists propaganda.

Third. Even making due allowance for bombast and for circumstances, Gallucci's writings and speeches both before and after August 6, 1940, far from exhibiting even as embryonic allegiance to the United States, display a passionate loyalty to the land of his origin. On the program of the annual Dopolavoro dance, held June 28, 1937, Gallucci wrote and caused to be printed a statement extolling the parent Society in Italy as "the new Fascist organization" enthusiastically supported "in very concrete fashion by the steadily increasing number of those organized in Italy, in the Colonies and in foreign countries." This statement was concluded as follows: "Members of the Dopolavoro! Let our reverence and devoted thoughts be turned to our magnificent Duce, to his Majesty King and Emperor and to the splendid Nation which extends us her hospitality for Fascist Italy and warning to the entire world. Eia, Eia, Eiai, Alala!" The last is admittedly the Fascist cheer. In a speech delivered at Faneuil Hall in 1938 or 1939 Gallucci stated: "If you are not a Fascist you cannot be a good Italian." At the inauguration of the Boston Chapter of the Society in February, 1939, he characterized the Italian as "a non-degenerate heir of the most noble race which has always given and continues to give to the world whatever of the best that modern civilization possesses," and exhorted his audience to remember that "the bonds of blood which unite Italians all over the world cannot·be dissipated throughout the generations ei-

ther by changes in language or nationality." The Italian Consul, who was present, was described as the "representative of His Majesty and our most beloved Duce, Benito Mussolini." Democratic leaders were characterized by the defendant as "those big good-for-nothings—big only because of their own vanity and lack of ability". Fascism was pronounced to be "true Democracy", and the speech was brought to a close with: "Here, Mr. Consul, in the outpost and in the front line, the members of the Dopolavoro of Massachusetts speaking through me, and directing toward you, their most enthusiastic shout of 'courage' and in me they unite in crying to the high heavens their pride in being Italians. Long live Italy! Long live Imperial Rome! Long live the King! Long live Benito Mussolini!"

In the summer of 1940, after his return from Italy, Gallucci reported on the excellence of conditions in Italy to the East Boston Chapter of the Society and conveyed the greetings of Mussolini and of the Italian people.

On August 7, 1940, the day after his naturalization, Gallucci spoke before the Boston chapter and stated: "All are calm and united at the side of their 'Duce'." He asked all the members to be calm and collected and predicated a glorious and illustrious victory for Italian armies.

On October 12, 1940, at the inauguration of the S. S. Dino Chapter on board the vessel of the same name, Gallucci remarked that Columbus Day was "being celebrated with a holiday for the people who have profited by Columbus' discovery and with a shameless ingratitude towards the nation which gave birth to Columbus." He voiced the further sentiment that "Rome, twice an Empire, spiritual and divine Rome, Rome the eternal distributor of good, is and will always be the only and inexhaustible source of light in the world." This speech was concluded with "a salute to the distant Fatherland, to the Duce and to the sovereign," and with "Long live Italy."

There is further testimony from the defendant's private secretary, also an officer of the Dopolavoro, that the defendant made speeches before the different chapters of the Society in 1939, 1940, and 1941 praising Mussolini and his regime.

The defendant denied the sincerity of some of these utterances and characterized them, on the witness stand, as just "words." But the defendant never explained what motivated him in the first place to make these speeches whose sincerity he now finds it expedient to deny. The Society was not financially profitable to Gallucci; in fact, so far as the record shows, it was a liability. Consequently, there is no question here of economic compulsion or compromise. Nor can his speeches be explained away on the ground that he wished to attain social prominence and prestige, for it is not the fact that he made speeches which demands explanation, but their tenor and content. The latter clearly evidence a strong fidelity to Italy and the Fascist regime both before and after the defendant's naturalization and shift to the defendant the burden of going forward with proof by way of explanation. Baumgartner v. United States, supra. The defendant has not sustained that burden.

Fourth. One particular item of conduct was brought to light at the trial which fits in and completes the picture, already suggested by the three preceding categories of evidence, of a man actively engaged, at the very least unofficially, in serving Italy and the Fascist regime. Sometime in 1939, one Lupoli handed to the defendant at the office of the Society two passport size photographs of himself. Two weeks later the defendant handed back to Lupoli in the same office an official card of membership in the Fascist Groups Abroad with Lupoli's photograph superimposed upon it. When Lupoli asked: "How much is it Frank?" Gallucci replied: "The same, $3 * * * the same as before." The witness Psaila who was in the office at the time characterized the transaction as "a kind of renewal." Psaila testified that payment was made by check and deposited to Gallucci's personal account. He was able to recall a similar transaction between Gallucci and one Farese. Guiseppe di Flumeri, a native born citizen of the United States, testified that the defendant Gallucci encouraged him to become a Fascist for the sake of superior privileges obtainable as a consequence in Italy. There was also testimony that the defendant kept a number of Fascist Party buttons in a drawer at the Society headquarters.

The effect of this evidence becomes unmistakably clear in the light of expert testimony which established that the Fascist Groups Abroad were officially recognized as "obedient instruments of the Fascist State" directly controlled by the Italian government in Rome. An applicant for

citizenship who, within a year of taking his oath of allegiance, was actively engaged in undermining the allegiance of other citizens of the United States could not possibly swear a true oath of allegiance to this country; under the circumstances such an oath would be self-contradictory. With the present defendant, it was Mussolini and Italy first. He had little, if any, interest in the United States. He spent practically all his time in America proving his allegiance to Il Duce. His conduct clearly and unequivocally cannot be reconciled with a finding that he had no mental reservation with respect to his allegiance to Italy when he took his oath to foreswear all allegiance to a foreign power. I believe also that the conclusion of ultimate fact just made is very strongly supported when the evidence with respect to his intention to return to Italy is discussed later in this opinion.

 This court recognizes that it is the defendant's state of mind when he took the oath of allegiance and not his state of mind at some other time which is relevant. It has been clearly established, however, that acts and declarations subsequent to the relevant time are available to support a finding as to allegiance (Baumgartner v. United States, supra) from which it would follow that conduct and utterances closely prior to the relevant time would also be properly available. Accordingly, on the basis of the above evidence this court finds that the defendant knowingly swore to the United States of America a false oath of allegiance.

A second ground assigned by the government for cancellation of the defendant's certificate of naturalization is that the defendant fraudulently represented under oath on March 7, 1940, in his petition for naturalization an intention to reside permanently in the United States; that the defendant had no such intention on March 7, 1940.

The applicable provisions with respect to permanency of residence are set out in the margin.[2]

 It is clear that the applicant for citizenship must at the time of his naturalization have formed an intention to reside permanently in the United States. Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101. Sections 4 and 27 of the Act of 1906 required the applicant's petition for naturalization to set forth under oath that it was his intention to reside permanently in the United States. The defendant's petition filed March 7, 1940, does set forth his intention to reside permanently in the United States, but the government contends, and this court finds, that such was not his intention.

The defendant readily admitted at the trial that his only purpose in coming to this country in 1933 was to liquidate his

---

2 The Act of June 29, 1906, 34 Stat. 596, as amended 53 Stat. 843, provides as follows:

"Sec. 4. That an alien may be admitted to become a citizen of the United States in the following manner and not otherwise:

"First. He shall declare on oath before the clerk of any court authorized by this Act to naturalize aliens, or his authorized deputy, in the district in which such alien resides, two years at least prior to his admission, and after he has reached the age of eighteen years, that it is bona fide his intention to become a citizen of the United States and to reside permanently therein. * * *

"Second. Not less than two years nor more than seven years after he has made such declaration of intention he shall make and file, in duplicate, a petition in writing, signed by the applicant in his own handwriting and duly verified, * * *.

"The petition shall set forth that * * * it is his intention to reside permanently within the United States * * *."

Section 2 of the Act of September 22, 1922, as amended May 24, 1934, 48 Stat. 797:

"That an alien who marries a citizen of the United States, after the passage of this Act, as here amended, or an alien whose husband or wife is naturalized after the passage of this Act, as here amended, shall not become a citizen of the United States by reason of such marriage or naturalization; but, if eligible to citizenship, he or she may be naturalized upon full and complete compliance with all requirements of the naturalization laws, with the following exceptions:

"(a) No declaration of intention shall be required.

"(b) In lieu of the five-year period of residence within the United States and the one-year period of residence within the State or Territory where the naturalization court is held, he·or she shall have resided continuously in the United States, Hawaii, Alaska, or Porto Rico for at least three years immediately preceding the filing of the petition."

wife's financial interests and then return to Italy to reside permanently. To eliminate the inconvenience arising from his alien status in applying for driver's license, automobile registration and similar licenses, and to facilitate the winding up of his wife's affairs, he decided to become a citizen of the United States. Accordingly, on April 5, 1935, he filed in this court (not necessary under the provisions of Section 2 of the 1922 Act) a declaration of intention Numbered 254620, in which he made the following statement under oath: "* * * and it is my intention in good faith to become a citizen of the United States of America and to reside permanently therein." On the witness stand, however, the defendant frankly admitted that until as late as January, 1940, he had no intention of residing permanently in this country. Gallucci's private secretary, Joseph Psaila, testified that Gallucci declared in July of 1940 that it was his intention to return to Italy to live. This statement to Psaila was made after he filed the petition for naturalization in which he swore that he intended to reside permanently in this country and after he returned from Italy where he had an opportunity to observe conditions. Another significant fact established by the evidence is that he, the defendant, still has an apartment in Naples which his father gave to him when he was married and he still possesses all his household furniture, now located in his sister's house in Naples. The inference is inescapable that his oath in his petition for naturalization was false when he swore that he intended to reside permanently in the United States and that in fact he intended to remain no longer than was necessary to accomplish the ends for which he originally came. His conduct has indicated that one of those ends was to teach the loyalty to Fascism and Mussolini which he himself never foreswore. The alleged change of intention was brought about suddenly, according to the defendant, by newspaper reports that Italy was largely in control of Germany. It would seem, however, that if, during seven years residence in this country, the defendant never formed a positive intention to reside here permanently, a sudden decision not to return to Italy because of conditions prevailing there then would at most be a decision to remain here only until those conditions had changed. It is also significant that later in 1941 or early in 1942 after Italy declared war on the United States, the defendant Gallucci consulted William Pote, manager of a local radio station who had previously leased radio time to Gallucci, about returning to Italy with the Italian Consul and his staff. He gave as his reason for consulting Pote that the Italian Consul wanted him to return to Italy unless he could renew his Italian language broadcasts. When Pote reminded him of his American citizenship, Gallucci remarked that in Italy American citizenship meant nothing. Finally, with respect to this issue, it should be stated that the readiness with which the defendant swore a false oath in the declaration of intention filed in 1935 at which time he admitted he intended to return to Italy buttresses the conclusion of this court that he swore falsely in his petition filed March 7, 1940.

There remains the defense of res adjudicata by reason of the decree of this court rendered August 6, 1940, admitting the defendant to citizenship.

It is true that no principle is more firmly established in the law than that against the relitigation of matters which already have or, with due diligence, might have been litigated. It is equally well established that when litigation has been prevented by fraud, relief may be had against any judgment, whether legal or equitable, so obtained. Freeman on Judgments, 5th Ed., Vol. 3, p. 2562, sec. 1231. The courts early distinguished, however, between fraudulent litigation and fraudulent prevention of litigation. The former was denominated "intrinsic" fraud and was not considered in itself a ground for the re-examination of a judgment. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Restatement, Judgments, Sec. 126. Only the latter, which was termed "extrinsic" or "collateral" fraud, was held to supersede the principle of res adjudicata. Kibbe v. Benson, 84 U.S. 624, 21 L.Ed. 741; Restatement, Judgments, Secs. 119–125.

The only ground offered by the government for setting aside this decree of naturalization is perjury by the defendant, the classic type of intrinsic fraud, so that independently of statute there would be no ground for equitable relief. Freeman on Judgments, supra, Sec. 1241, pp. 2582, 2583. But cf. Graver v. Faurot, 7 Cir., 76 F. 257. In Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066, however, the Supreme Court upheld the constitution-

972

ality of Section 15 of the Act of 1906 [3] which it construed as providing for direct attack upon certificates of citizenship on the ground of intrinsic fraud. In that case, as in the case at bar, the government did not appear in the original proceedings to contest the petition; in consequence, the court treated the naturalization proceedings as an ex parte "investigation" to which it refused to apply the judicial doctrine of res adjudicata. It is true that when Johannessen was naturalized the government had no statutory right to intervene in the original proceedings such as it had by virtue of Section 11 of the Act of 1906, 34 Stat. 599, when the defendant Gallucci was naturalized. But the Supreme Court clearly indicated in the Johannessen case that it was the fact vel non of appearance which was important, and that a mere unexercised right to appear on the part of the government would not of itself transform what was in fact an ex parte inquiry into an adversary, judicial litigation. The proceedings having been in fact ex parte, the decree was likened to a public grant of land or of letters patent and held revocable because of the perjury of two witnesses to the petitioner's term of residence.

Some doubt has been cast on the authority of Johannessen v. United States, supra, by the recent case of Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. In the first place, the fact of appearance or lack of appearance by the government in the naturalization proceedings was not deemed important to the question of the nature of the decree. After pointing out that under Section 11 of the Act of 1906 the United States had the right to appear, to cross-examine the petitioner and his witnesses, to introduce evidence, and to oppose the petition, the court said (320 U.S. at page 123, 63 S.Ct. at page 1336, 87 L.Ed. 1796): "The record before us does not reveal the circumstances under which petitioner was naturalized except that it took place in open court. We do not know whether or not the Government exercised its right to appear and to appeal. Whether it did or not, the hard fact remains that we are here re-examining a judgment, and the rights solemnly conferred under it." Secondly, the court questioned the analogy drawn in the Johannessen case between a naturalization decree and a public grant of land or of letters pat-

ent. The court in the Schneiderman case, 320 U.S. at page 124, 63 S.Ct. at page 1336, 87 L.Ed. 1796, footnote 3, stated: "Since 1790 Congress has conferred the function of admitting aliens to citizenship exclusively upon the courts. In exercising their authority under this mandate the federal courts are exercising the judicial power of the United States, conferred upon them by Article III of the Constitution. Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738. For this reason it has been suggested that a decree of naturalization, even though the United States does not appear, cannot be compared (as was done in Johannessen v. United States, 225 U.S. 227, 238, 32 S.Ct. 613, 615, 56 L.Ed. 1066) to an administrative grant of land or of letters patent for invention, and that the permissible area of re-examination is different in the two situations." At page 135 of 320 U.S., 63 S.Ct. at page 1341, 87 L.Ed. 1796, the court said: "As pointed out before, this is a denaturalization proceeding, and it is a judgment, not merely a claim or a grant, which is being attacked." And in the separate concurring opinion of Mr. Justice Rutledge, the following appears at page 168 of 320 U.S., 63 S.Ct. at page 1357, 87 L.Ed. 1796: "It is a *judgment* (the court's italics) which is being attacked. Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738. * * * it is a *judgment* (the court's italics), rendered in the exercise of the judicial power created by Article III, which it is sought to overthrow (Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738), not merely a grant like a patent to land or for invention. (Cf. Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066.)" Thirdly, the court seemed possibly to question the power of Congress to re-examine naturalization decrees except for extrinsic or collateral fraud (320 U.S. at page 124, 63 S.Ct. at page 1336, 87 L.Ed. 1796): "Because of the view we take of this case we do not reach, and therefore do not consider, two questions which have been raised * * *. The first question is whether, aside from grounds such as lack of jurisdiction or *the kind of fraud which traditionally vitiates judgments* (italics mine), cf. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Kibbe v. Benson, 17 Wall. 624, 21 L.Ed. 741, Congress can constitutionally attach to the exercise of the judicial power under Article

---

[3] Sec. 15 of the Act of 1906 is the prototype of Sec. 338 of the Nationality Act of 1940 upon which the government is now proceeding.

III of the Constitution, authority to re-examine a judgment granting a certificate of citizenship after that judgment has become final by exhaustion of the appellate process or by a failure to invoke it." Of the two cases cited in illustration of the "kind of fraud which traditionally vitiates judgments," United States v. Throckmorton, supra, is the leading exponent of the distinction between extrinsic and intrinsic fraud and Kibbe v. Benson, supra, is a case of extrinsic fraud. In the concurring opinion of Mr. Justice Rutledge, the same two cases are cited as "causes * * * such as have been held sufficient to overturn other decrees." Schneiderman v. United States, supra, 320 U.S. at page 168, 63 S.Ct. at page 1357, 87 L.Ed. 1796.

These excerpts would seem to question the reasoning basic to Johannessen v. United States, supra. On the other hand, the issue of fraud was not directly raised in Schneiderman v. United States, supra, on appeal to the Supreme Court, see 320 U.S. page 122, page 131 (f. n. 7), page 159 (f. n. 54), page 165, 63 S.Ct. pages 1335, 1339, 1353, 1355, 87 L.Ed. 1796, whereas in the case at bar the averment of fraud is elaborated and set forth as a specific charge in the complaint. Further, in this proceeding, fraud has been proved with respect to the grounds for cancellation that have been discussed. Moreover, in his separate concurring opinion Mr. Justice Douglas, not only concedes that certificates of citizenship can be set aside for fraud but fails to draw any distinction between extrinsic and intrinsic fraud: "Fraud connotes perjury, concealment, falsification, misrepresentation or the like." Schneiderman v. United States, supra, 320 U.S. at pages 161, 162, 63 S.Ct. at page 1354, 87 L.Ed. 1796. Finally, the opinion of the court does not completely foreclose the possibility of re-examining decrees of naturalization: "This does not mean that once granted to an alien, citizenship cannot be revoked or cancelled on legal grounds under appropriate proof." Schneiderman v. United States, supra, 320 U.S. at page 122, 63 S.Ct. at page 1335 Until the higher authority explicitly qualifies Johannessen v. United States, supra, this court must hold that a decree of naturalization may be overturned for intrinsic fraud proved by clear, unequivocal and convincing evidence.

The defense that Section 338 of the Nationality Act of 1940 constitutes a legislative usurpation of the judicial power conferred on the courts by Article III of the Constitution may be answered best by again referring to the Johannessen case, supra. It has no merit in view of this authority. (I have assumed here that the defendant intended to raise this defense, but in error questioned the constitutionality of Section 15 of the 1906 Act under which the present proceedings obviously were not instituted.)

It is unnecessary to consider the other grounds set forth in the government's complaint.

The final order of this court admitting the defendant, Francesco Paolo Gallucci, to citizenship in the United States of America is hereby revoked, set aside and declared void; Certificate of Naturalization Number 4921912 issued to the defendant Francesco Paolo Gallucci is hereby declared cancelled and ordered to be surrendered to the Commissioner of Immigration and Naturalization.